[Crim. No. 11436. Fourth Dist., Div. One. Aug. 11, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
DION RENE CLARK, Defendant and Appellant.

COUNSEL

Appellate Defenders, Inc., under appointment by the Court of Appeal, and Handy Horiye for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Richard D. Garske, Michael D. Wellington and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WIENER, J.▮▮▮  In *People* v. *Guthreau* (1980) 102 Cal.App.3d 436 [162 Cal.Rptr. 376], we held the testimony from a "rape expert" was inadmissible in a criminal prosecution for forcible rape (Pen. Code, § 261, subd. 2). We explained the issue is not whether in some abstract sense the victim's resistance was reasonable, but whether the resistance was sufficient to reasonably manifest her refusal to the defendant. (*Id.*, at p. 441.) The expert's opinion of the prosecutrix's resistance was irrelevant to the defendant's good faith reasonable belief as to the resistance. (*Id.*, at p. 442.) In this appeal by defendant from judgment of convictions of forcible rape and oral copulation (Pen. Code, § 288a, subd. (c)) we decide the error in admitting the rape expert's testimony was prejudicial. We reverse the judgment.

The test of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], requires our examination of the entire record in order to determine whether it is reasonably probable a result more favorable to the defendant would have been reached in the absence of the erroneously admitted evidence. In light of that mandate, we fully summarize both the prosecution and defense evidence.

*Prosecution Evidence*

On May 28, 1978, Miss W., then 21 years old, had been living in San Diego for only a short time. She was in the Navy and resided with her fiancee on Cauby Street near Highway 8 and Rosecrans. While waiting for a bus in San Diego she was approached by Clark, a taxicab driver, who asked if she wanted to take a cab. Because she did not want to take a cab, she responded she only had 35 cents, when in fact she had more

money. In spite of her response, Clark offered to take her where she wanted to go for that sum.

Once in the front seat of his taxi, Miss W. told Clark she lived in the vicinity of Midway and Rosecrans. The two engaged in "small talk." As Clark started to turn at Midway and Rosecrans, Miss W. said she lived the other way. He continued to drive to Highway 8. During the ride she wondered where they were going; on three occasions she looked at her watch and said, "I better be getting home."

About 9 p.m., Clark left the freeway and entered a residential area where he lived. The two got out of the cab. As they reached the walk to Clark's house, Miss W. opened her purse, took out a $5 bill and offered it to him. She said, "Here take this for as far as you have taken me and I will try to find a phone and call another cab." Clark refused the money. He did not know what he had done to make her mad and offered to take her home. They got back into the cab.

By this time, Miss W. distrusted Clark and thought he was weird; she was frightened. She answered his questions only to avoid making him angry. She realized Clark was not taking her home. She was fearful he was either going to rob or beat her. After driving for about 30 minutes, Clark pulled on to a dirt road and stopped the car.

Miss W. attempted to open the door. He grabbed her arms; she became more frightened; she also became angry. She said, "You better let me go." She called him a son-of-a-bitch and said if he did not let her go her boyfriend would kill him. She repeatedly told him in a threatening manner he better let her go.

They struggled for about a minute. Clark was on top of her as he opened the right door. He said, "Hey, come on. What's wrong? Hey, I don't want to hurt you; I just want to love you." She told him to let her go. He put his weight on her and started to push her down on the seat. Realizing her threats were not working and fearing for her life, Miss W. gave up; she ceased resisting.

She said, "If you really care for me, why don't we do it at your house instead of in a car." Clark said, "Yeah, okay, but let me do this first." He undressed her and placed his mouth on her vagina. She was scared, but said it felt good to prevent the defendant from hurting her. They had sexual intercourse and she orally copulated him. When she was

dressing outside of the cab, Clark had both hands around her and on top of the cab. She felt she could not get away. She kissed him only to avoid antagonizing him as she thought he might otherwise kill her.

In driving back to the city, she tried to get a good look at him for she planned to call the police. She also checked the vehicle license. At his residence, she ran away; he did not chase her. She ran for a couple of blocks until she saw a man, grabbed his jacket, and asked for help. She was upset and crying, but too embarrassed to explain what had happened. He took her to a nearby telephone where she called Harry Day, a friend of her fiancee. It was between 10 p.m. and 10:20 p.m. The man had to tell Day where they were for she was too hysterical, crying and screaming. She was still upset when Day arrived. She told him she had been raped. Once at her apartment her fiancee promptly called the police.

San Diego Police Officer Linda Lee Collins also testified. Her job was to foster understanding and awareness among the public concerning sexual assaults, ways to avoid these assaults and use of self-defense. She gave her expert opinion in answer to a hypothetical question based on the facts of this case. She said a victim under similar circumstances was unable to effectively use self-defense for it would only irritate the assailant. Not resisting was preferable to resisting, for a sexual assault was better than murder. Screaming also would be useless for the area was desolate. It was a good idea for the victim to attempt to get the attacker to take her to a more populated area where chances of escape were better. In her opinion, the conduct of the victim was reasonable.

*Defense Evidence*

Defendant testified he picked up the victim to get a fare and to get to know her. When he got to Midway and Rosecrans she did not ask to get out. He kept driving. Miss W. talked about her argument with her boyfriend and various other personal matters. When they arrived at the State Theater, her designated location, she still did not want to get out of the cab. Defendant then drove her to his house. After they got there, he was surprised when she gave him the $5. They then drove out to the country where defendant put his arms around her. She screamed and threatened him. He did not know why she was scared and told her he did not intend to hurt her. He just wanted to love her. He calmed her down; she said she liked him. They had sexual relations; they held each

other and talked. However, as they returned to town she got colder and eventually ran away from the vehicle.

*Discussion*

Every case involving the application of the *Watson* standard requires a difficult weighing process. An appellate court must retrospectively evaluate the impact of error—here, the error in allowing one witness' testimony—on the jury verdict. The appellate task is far different than that of the scientist who is able to perform his analysis in the sterile and controlled atmosphere of the laboratory. The court's job is to glean information from a record before and after excising from that record improperly admitted evidence to arrive at probabilities—whether absent the error it is reasonably probable a different result would have been reached. The nature of the test then is thus directly related to the amount and quality of evidence on the respective sides.

The case before us is a close one. It is one where additional testimony for or against a party becomes determinative. Here the victim's credibility was pitted against that of the defendant. When the case was previously tried, without Officer Collins' testimony, there was a mistrial. An evenly divided jury was unable to either convict or acquit. In the second trial, Officer Collins testified, over objection by defense counsel on grounds which included Evidence Code section 352—the evidence created substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

The court's concern with admitting the expert's testimony is apparent in the colloquy between court and counsel when the admission of the evidence was fully debated. The trial judge questioned whether an expert was even necessary. He opined the nature of the testimony and the conduct of the parties were sufficiently understandable to jurors from their own common experience and knowledge that an expert's opinion was superfluous. In pondering the effect of the testimony, if error, on the appellate court, he asked, "[I]f it comes in and it's error...it's just reversible error, isn't it?" The deputy district attorney answered, "That's right." On another occasion in speculating on the frustration of the Attorney General if a conviction were to be reversed because of his ruling, the deputy district attorney again candidly stated she understood the risk involved and acknowledged, "[I] feel under these facts, this testimony would be of great assistance to the jury." When the Attorney

General's representative urged the admission of the evidence as necessary to assist the jury in determining whether the subjective state of mind of the victim was objectively reasonable, he said, "[I]t's essentially that the utilization of the expert in this case is merely to corroborate the testimony by the victim as to the subjective state of mind; . . . I think that should be evident to increase essentially her credibility is all it really comes down to." Counsel conceded "[T]here's no question here that the testimony of the expert was very compelling."

We have not selected bits and pieces from the transcript to embarrass prosecution counsel. On the contrary, we appreciate the professional manner in which this difficult issue was presented to the trial court and the careful analysis made in examining the intellectual difficulties of the problem. We recognize that new law can only be made when diligent counsel conscientiously and imaginatively attempt to develop theories which, of necessity, must be tested in the appellate court. We do not, in any way, wish by this decision to chill good faith efforts of counsel to improve the law. We concede our infallibility may well exist only because on some occasions we are final.

Nevertheless, our review must be made on a case-by-case basis. We are mindful that in *Guthreau* we said the expert's testimony did not disturb the jury's evaluative process because of our conclusion the testimony had no probative value. The facts here are substantially different than in *Guthreau* where defendant failed to make an Evidence Code section 352 objection. The comments from counsel and the court have given us the full flavor of the proceedings from which we are able to more accurately assess the impact of the expert's testimony on the jury. After our review of the entire record and in light of those comments, we conclude it is reasonably probable a result more favorable to defendant would have been reached in the absence of the error.

*Disposition*

Judgment reversed.

Brown (Gerald), P. J., and Staniforth, J., concurred.

A petition for a rehearing was denied August 19, 1980, and respondent's petition for a hearing by the Supreme Court was denied October 8, 1980.