[Crim. No. 23106. June 14, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM McKEE BLEDSOE, Defendant and Appellant.

## COUNSEL

Michael R. Collins, under appointment by the Supreme Court, for Defendant and Appellant.

Quin Denvir, State Public Defender, and Lisa Short, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Michael D. Wellington, Patricia D. Benke and Louis R. Hanoian, Deputy Attorneys General, for Plaintiff and Respondent.

Robin B. Johansen, Kathleen J. Purcell, Joseph Remcho and Remcho, Johansen & Purcell as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KAUS, J.**—Defendant William McKee Bledsoe appeals from a conviction of forcible rape. (Pen. Code, § 261, subd. (2).) The principal issue on appeal is the propriety of the trial court's admission of expert testimony by a rape counselor that, after the incident in question, the alleged victim suffered from "rape trauma syndrome." As we explain, although in a rape prosecution expert testimony on the after effects of rape may be admitted for a variety of purposes, we conclude that the evidence in this case was not admissible for the purpose for which it was offered—namely, to prove that a rape had occurred. We also conclude, however, that it is not reasonably probable that the error in admitting the testimony affected the verdict. Accordingly, we affirm.

I

The prosecution's evidence revealed the following facts. On November 13, 1981, Melanie, then 14 years old, went to a party at a friend's home in Huntington Beach. Her mother drove her to the party. Melanie said that she would get a ride home between 11:30 and midnight from one of her boy-

friend's friends. She knew most of the people at the party, including defendant Bledsoe, aged 28, who was also an invited guest. At the party Melanie moved throughout the house having casual conversations with her friends; she did not spend much time with her boyfriend because he seemed to be angry with her, although she did not know why. During the party Melanie drank some beer—taking sips from other people's cups—and used a small quantity of cocaine that one guest had brought to the party. Defendant had several cups of beer but no cocaine.

About 11 p.m., Melanie asked defendant if he would drive her home and he agreed. After leaving the party they first stopped at a friend's house, intending to pick up a girlfriend of Melanie's who was to spend the night at her house. After learning that her friend could not sleep at her house after all, Melanie and defendant began to drive to Melanie's home, but on the way defendant told her that he needed to stop by his house—a shack or trailer in a somewhat isolated area about 10 minutes away—to pick up some money. On the way, Melanie noticed a knife under the driver's seat; when she picked it up and asked what it was for, defendant said simply that "it comes in handy" and asked her to put it back. She did.

When they arrived at defendant's house, he invited Melanie in and she entered because she needed to use the bathroom. As she was zipping up her skirt in the bathroom, defendant came up behind her and put a rag with a strong odor over her mouth, making her dizzy. He then began pulling her into the living room; she kicked and hit him and, at one point, freed herself and ran to the door. When she could not open it, he grabbed her, struck her face with his hand and threw her onto a couch. Straddling her, he used one hand to hold her down and the other to attempt again to cover her mouth with the odor-filled rag. In the process, a button was ripped from her skirt or blouse.

Defendant then told her that he would cut her throat if she did not do what he wanted. He also told her that there were "other guys" in the house who would do the same thing to her if she did not cooperate. She stated that he put his hand over the edge of the couch and that she thought he had a knife. Believing his threats and in fear for her life, Melanie did not offer any further resistance.

After taking off their clothes, defendant told Melanie he was "going to make her a woman." He removed a tampon from her and had sexual intercourse with her. Afterward, she begged him to take her back to the party, kissing him and promising not to tell anyone what had happened. He agreed to bring her back. As she waited outside his house for him, she became

dizzy and vomited. On the way back to the party he said: "I don't care if you tell anybody what I did because it was worth it."

Defendant dropped her off at the house where the party had taken place. When she entered the house she was crying and extremely upset and told the friends who were present what had happened; they tried to comfort her and called the police. Several of the male guests at the party, enraged by the incident, drove to defendant's residence to confront him. He met them with a bayonet in hand and denied that he had attacked Melanie; the group attacked him, knocking him unconscious. Some time later, the police came to investigate and found defendant bleeding badly; he told them he could not remember how he had received his injuries. He was arrested and charged with (1) forcible rape, (2) use of a weapon during the commission of the rape, (3) assault with a deadly weapon, and (4) false imprisonment.

At the trial, Melanie testified to most of the facts related above. Several witnesses confirmed that as soon as Melanie was dropped off by defendant after the incident, she reported that she had been raped, was extremely upset and emotionally overwrought, and had sustained numerous bruises to her face and other parts of her body during the time she was alone with him. The investigating police officers and examining doctor similarly testified to Melanie's emotional trauma and physical injuries in the period immediately following the incident.[1] In addition, Melanie's mother testified that the next morning Melanie was "very frightened, sometimes almost hysterical, cried a great deal, almost in shock." When asked whether Melanie had had any type of "emotional problems or outbursts" since the incident, her mother responded that she was "despondent, depressed, nightmares, bouts of crying, inability to make decisions, confusion."

As the final witness in its case-in-chief, the prosecution called Leslie Jacobson-Wigg, a rape counselor who had treated Melanie on a number of occasions after the incident and who the prosecution indicated would testify that Melanie was suffering from "rape trauma syndrome." Defense counsel requested that the court hold a hearing outside of the presence of the jury pursuant to Evidence Code section 402, subdivision (b)[2] to determine the admissibility of the evidence that was to be elicited from the counselor.

---

[1] Although Melanie's mother and her friends all testified that in the hours after the incident they smelled a distinctive, ether-like odor on Melanie, neither the investigating officers nor the examining doctor detected any such odor.

[2] Section 402, subdivision (b) provides: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

Although the court had initially indicated that it would hold such a hearing, it ultimately changed its mind, explaining that it felt that "it is wasteful to conduct a 402 hearing in that if the court determines, in a hearing conducted before the jury, that the witness lacks qualification to form an expert opinion, the court will disallow the forming of opinion and information before the jury and the testimony would have no value and no meaning and the court would thereby not have to hear the testimony twice."

Defense counsel objected to this procedure, arguing that it was improper to permit the witness to testify "without a more sufficient offer of proof as to relevancy. I don't understand the relevance behind her testimony . . . we're getting into collateral issues of this particular victim's subsequent therapy, which I don't feel appropriately deals with her observations on the evening of the 13th." The court overruled the objection, stating: "The relevance obviously is that a rape occurred and the continuing condition and strife of the victim is further evidence of the fact that a rape occurred, as opposed to evidence that, in fact, a rape did not occur." On this basis, the court denied the request for a section 402 hearing and permitted the rape counselor to testify immediately before the jury.

After describing her qualifications as a licensed marriage, family and child counselor with considerable experience in counseling rape victims,[3] Jacobson-Wigg was asked: "[B]ased on your training and experience and your own personal interviews, is there any set pattern of reaction on the part of rape victims to the event itself?" She responded: "There is something that's coined rape trauma syndrome, which is the umbrella terminology for what a rape victim experiences and it basically describes parameters that I think, you know, 99.9 percent rape victims are going to fall within."[4]

---

[3]Jacobson-Wigg, who has a masters degree in "inter-disciplinary studies"—a "combination of psychological studies and sociological issues"—testified that she was a "technical reserve" at the Huntington Beach Police Department and, in that capacity, saw rape victims the department referred to her. She also was the director of the "Rape Prevention and Education Program" at the University of California, Irvine, and provided the campus community with education and counseling regarding issues concerning sexual assault. Jacobson-Wigg testified that between referrals from the police department and her own private practice, she had personally interviewed 50 to 60 rape victims.

[4]Although our review of the professional literature cited by the parties and amici confirms that rape trauma syndrome is, indeed, an "umbrella terminology" which includes a very broad spectrum of physical, psychological and emotional reactions, the studies we have seen do not suggest that the syndrome is quite as universal as the witness' testimony indicated. For example, in the seminal 1974 study in this field which coined the term "rape trauma syndrome," the authors reported that 13 of the 92 subjects showed no symptoms and denied having any symptoms when specifically asked. (Burgess & Holmstrom, *Rape Trauma Syndrome* (1974) 131 Am.J.Psychiatry 981, 983.) This is not to suggest, of course, that recent studies have determined that rape does not have very serious consequences for the overwhelming majority of its victims. On the contrary, as one of the more comprehensive recent works states: "The data described in the preceding chapters reinforce one central conclu-

In explaining rape trauma syndrome, the counselor stated: "Basically what it is, it's a stress reaction; it's acute stress reaction to trauma. And the reason it's termed a stress reaction is because very typically . . . an assailant in a sexual assault situation, threatens the victim with their life. So what the victim experiences is a direct threat to her life, whether or not in some cases a weapon is even in evidence . . . . Basically, it's an acute stress reaction to the threat of being killed, and there are three phases of the syndrome."

She then went on to describe the phases: "First is the disorientation which includes . . . what is called the immediate impact reaction and that's a term that describes the emotional experience that the victim experiences . . . during the rape and in the hours immediately following the rape. [¶] And in the immediate impact reaction, there are two different styles that the victim will demonstrate: one is the stress style where the victim is obviously agitated, where she shows clearly that she is fearful and anxious. And then there's the [controlled style] where the victim appears, in fact, very controlled, her feelings are masked, her affect is subdued. She may laugh; she may talk as though nothing has happened; she may giggle; she may look very inappropriate for someone who's just been assaulted. But those are normal defense postures for victims who fall within that range."

The counselor then went on to the second phase. "[T]he second phase is what's called the reorganization phase, and that's when the victim begins to act again as though she's just fine. Her behavior is such that you see a lot of movement. [¶] In the first phase, in the disorganization stage, she's talking a lot about how she's feeling, and, obviously, under a lot of stress, and, in the second phase she starts to function so she can get through her day, basically, and she doesn't focus so directly on the assault. She looks all right to the people around her . . . . The victim looks as though she's functioning for the most part. She's probably not functioning at a normal level; she is functioning at a somewhat below normal level, but she's functioning. . . . Before that, her cognitions and her thought processes would be so clouded with flashbacks of the attack; she couldn't concentrate, she couldn't focus on what was going on in front of her. And by the reorganization phase she's able to concentrate, although there is still flashing back at different points. [¶] What probably is going on is she's denying her experience to other people and she's still feeling the very powerful feelings herself."

sion: Rape is a devastating phenomenon. It dramatically changes the way in which the victim perceives and interacts with other people, and it often changes the way in which she perceives herself. Its effects are not always short-lived." (McCahill et al., The Aftermath of Rape (1979) p. 73.)

The counselor then described the third phase. "That's the integration phase and that's where the victim who has, for a period of time, been looking like she's doing all right, all of a sudden becomes sort of painfully depressed and starts to relive the incident, and that can be months, that can be even a year down the road. [¶] And what happens is that she has to, at that point, resolve feelings that she has about herself and about the assailant and about the world in general, which by then is pretty insecure to her. It's really a matter of having the rug pulled out from under her. There's a powerful fear reaction after a rape."[5]

When asked whether all rape victims pass through these stages, the counselor stated that "[s]ome rape victims never get out of the second stage, the reorganization, and that's the dangerous . . . point for them to stop emotionally, because what happens is that they not only suppress their feelings to other people, but some women suppress their feelings as far as themselves, and they inwardly deny that they're having these still powerful reactions. [¶] That's what's called the silent reaction and rape victims up until ten years ago, were not even given much permission to talk about rape. [¶] And these are women who call now, not clients, [who] were raped 20, 30, 40 years ago and are suffering terrible traumas and haven't dealt with it. And it has probably profoundly affected their lives."

After some further description of some of the general responses of rape victims—a general "fear response to all men" and a phobia, or irrational fear, about being alone—the counselor went on briefly to describe her contact with and general conclusions about Melanie. She testified that she had first seen Melanie three or four weeks before trial, which would have been about two months after the incident, and that she saw Melanie "within my role as a therapist with her as my client." She stated that "Melanie, at this point, is experiencing the reorganization phase, or the second phase of rape trauma syndrome, where she's able to function much more so like her normal self, but is still experiencing some trauma and flashbacks," indicating that Melanie had exhibited "[n]ightmares, difficulty in focusing her cognitions, or her thought processes, lack of ability to concentrate, a lot of flashbacks of the attack, a lot of fear," and "symptoms of being phobic about being alone, phobic about being in crowds, mistrust of men in general." Finally, the prosecutor asked her: "Based upon your experience in the past

---

[5]As Jacobson-Wigg indicated, some of the studies in this field have identified three general phases through which rape victims progress; other studies have classified the same type of reactions as falling into two phases. As one source notes: "Sandra Fox and Donald Scherl speak of three phases of adjustment: acute reaction, outward adjustment and integration. [Fox & Scherl, *Crisis Intervention With Victims of Rape* (1972) 17 Social Work 37, 37-42.] Ann Burgess and Lynda Holmstrom refer to 'the acute phase: disorganization' and 'the long-term process: reorganization.' [Burgess & Holmstrom, Rape: Victims of Crisis (1974) pp. 37-50.]" (McCahill et al., The Aftermath of Rape, *supra*, pp. 23-24.)

and your training in your interviews, and contact with Melanie, do you have an opinion as to whether or not she is currently suffering from this rape trauma syndrome?" She answered: "I think she's obviously suffering from it."

On cross-examination, when asked whether the acute stress reaction is "specialized only to a rape victim," the counselor responded: "These are acute stress reactions to different kinds of stressors but the most severe and the most long-lasting stress reactions are from deliberate manmade disasters of which rape is one, and would include others like bombs and torture." Defense counsel then asked whether, based on her education or studies, the counselor could "determine what portions of your patient interviews are accurate recollections of the prior incident and what are inaccurate recollections?" The prosecutor objected on the grounds of "no foundation, speculation" and the trial court sustained the objection. Defense counsel then asked whether the counselor had an opinion, based on her interviews, as to Melanie's emotional state when she was interviewed by a police officer several days after the incident, and the counselor said that she was "very agitated, frightened, nontrusting, maybe even experienced some anger, which is normal for a rape victim." Counsel then followed up and asked "[t]o what extent would those emotions which you've just described affect her ability to accurately recall the incident she was involved in back in November?" The counsel responded: "I would have to speculate about that; I don't know." Defense counsel asked: "You don't have any specific training that would tell you that?" and the counselor stated, "No, I don't."

On redirect, the prosecutor again asked the witness about the purpose of the initial sessions she had had with Melanie, and she explained that "[m]y purpose is to provide for her as safe an atmosphere as possible, and as nonjudgmental atmosphere as possible because this particular circumstance is one that's highly judged, not only by the victim herself, but by the culture at large, it's my responsibility to my client to provide her as safe and as comfortable an environment as I can possibly provide . . . ." At the conclusion of the counselor's testimony, the prosecution rested.

At the outset of the defense, defendant called two of the investigatory officers in an attempt to impeach various aspects of Melanie's testimony. One officer, who had searched defendant's residence on the evening of the incident, testified that he did not find any odor-filled rags or ether on the premises. Another officer, who had interviewed Melanie several days after the incident, testified that in that interview Melanie had stated that during the attack defendant had held a steak knife at her throat; at trial, Melanie was not sure whether or not defendant actually held a knife or only threatened to get one.

Defendant then took the stand and testified at some length to the events of the night in question. He stated that he and Melanie had spent much of the time at the party together, that she had been very affectionate with him, and that he took her to his residence at her request in order to smoke some marijuana that he had there. He testified that after sharing two marijuana cigarettes they began kissing and petting and ultimately had sexual intercourse; he said the entire incident was voluntary and that he had not used any force or violence. Although he admitted owning several knives, he denied ever threatening Melanie with them. When asked if he could explain the bruises and other injuries Melanie had sustained, defendant said he could not. In short, the defense was that Melanie had consented to the incident.

After a little more than a day of deliberation, the jury returned its verdict, finding defendant guilty of forcible rape, but also finding that he did not use a weapon during the commission of the rape and that he was not guilty of assault with a deadly weapon. The jury could not reach a verdict on the false imprisonment charge, which was dismissed at the request of the prosecution. The court eventually sentenced defendant to eight years in state prison, the upper term for forcible rape.

## II

As noted, defendant's principal claim on appeal is that the trial court erred in admitting the rape counselor's testimony on rape trauma syndrome. He maintains (1) that the trial court's action is inconsistent with the decisions in *People* v. *Guthreau* (1980) 102 Cal.App.3d 436 [162 Cal.Rptr. 376] and *People* v. *Clark* (1980) 109 Cal.App.3d 88 [167 Cal.Rptr. 51], where the admission of certain expert testimony of a rape counselor was held to be error, and (2) that, in any event, the testimony should not have been admitted because rape trauma syndrome does not meet the so-called *Frye* standard of reliability which California courts have applied in the past in determining the admissibility of new scientific methods of proof. (See, e.g., *People* v. *Kelly* (1976) 17 Cal.3d 24, 30-32 [130 Cal.Rptr. 144, 549 P.2d 1240] [applying test first enunciated in *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013, 1014 (34 A.L.R. 145)].)[6] In response, the At-

---

[6]Defendant additionally argues that the trial court erred in refusing to hold a section 402 hearing on the admissibility of the evidence outside the presence of the jury. As the Attorney General notes, by its terms section 402, subdivision (b), requires a hearing out of the presence of the jury only when the admissibility of a defendant's confession or admission is at issue; in other circumstances, the section grants the trial court discretion in the matter. Although—in view of the novelty of the proposed evidence and the advantages a section 402 hearing affords for providing the parties an opportunity to make a full record on the issue— it might have been preferable for the court to have proceeded with such a preliminary hearing out of the jury's presence, we need not decide whether the court abused its discretion in foregoing such a hearing, since we conclude in any event that the admission of the evidence, though error, was nonprejudicial.

torney General argues (1) that *Guthreau* and *Clark* are distinguishable and (2) that defendant did not properly preserve the *Frye* issue by his objection to the testimony below. An amicus brief filed by the California Women Lawyers on behalf of the People maintains that the evidence with respect to rape trauma syndrome does meet the *Frye* standard and was properly admitted.

With respect to defendant's first contention, we think it is clear that the Court of Appeal decisions in *Guthreau* and *Clark* are not controlling. In both of those cases, the expert witnesses—rape counselors employed by police departments—testified that under the circumstances in which the alleged victim found herself, the degree of resistance displayed by the victim was entirely reasonable. The court in *Guthreau* held that the admission of that testimony was error, explaining that the issue in a rape prosecution is "not whether in some abstract sense the victim's resistance was reasonable . . . [but] whether the resistance was sufficient to '*reasonably manifest*' her refusal to [the defendant]. [¶] If the defendant had a bona fide *reasonable* belief based upon 'all of the circumstances present' that the prosecutrix voluntarily consented, the defendant must be acquitted of forcible rape irrespective of how reasonable an expert views the victim's resistance under the circumstances. [Citations.] Evidence that an expert was of the opinion the prosecutrix's resistance was reasonable under the circumstances is irrelevant to the issue of [*the defendant's*] *bona fide belief.*" (102 Cal.App.3d at pp. 441-442 [citing *People* v. *Mayberry* (1975) 15 Cal.3d 143, 156 (125 Cal.Rptr. 745, 542 P.2d 1337)]; see also *People* v. *Clark, supra,* 109 Cal.App.3d at p. 90.)

In this case the rape counselor did not venture an expert opinion on the reasonableness of the extent of Melanie's resistance to defendant's actions, but rather testified to certain emotional symptoms which Melanie exhibited after the incident and that she was suffering from rape trauma syndrome. Although *Guthreau* and *Clark* do hold that *some* expert testimony by a rape counselor may be irrelevant and inadmissible in a rape prosecution, there is nothing in those decisions to suggest that *all* expert testimony by rape counselors is inadmissible. Clearly, the admissibility of expert testimony on a given subject must turn both on the nature of the particular evidence and its relation to a question actually at issue in the case. In short, *Guthreau* and *Clark* have no direct bearing on this case.

Defendant's second contention—that evidence of rape trauma syndrome is not admissible under the *Frye* standard—presents a much more substantial question. As noted, the People initially contend that the issue was not properly presented at trial and consequently may not be raised on appeal. It is true that at trial defendant did not cite *Frye* or its California progeny, but

he did object to the testimony on the ground that the prosecution had failed to make a sufficient showing of the relevance of the alleged victim's subsequent therapy to her observations at the time of the incident. As we shall see, in this case at least, there is a close connection between the relevance of testimony on rape trauma syndrome and the reliability of that testimony under the *Frye* test. Given that overlap of the issues, and, further, the fact that the trial court denied defendant's motion for a section 402 hearing at which the adequacy of the foundation for the testimony could have been more fully explored outside the presence of the jury (see fn. 5, *ante*), we think that it is proper to consider the claim here.[7]

Rape trauma syndrome is a rather recent concept[8] and, to date, there have been relatively few cases which have addressed the question of the use of expert testimony on the syndrome in a judicial setting. In a number of the cases in which the issue has arisen, the alleged rapist has suggested to the jury that some conduct of the victim after the incident—for example, a delay in reporting the sexual assault—is inconsistent with her claim of having been raped, and evidence on rape trauma syndrome has been introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault. (See, e.g., *Delia S.* v. *Torres* (1982) 134 Cal.App.3d 471, 478-479 [184 Cal.Rptr. 787] [delay in reporting assault]; *State* v. *Middleton* (1983) 294 Ore. 427 [657 P.2d 1215, 1219-1220] [inconsistent postincident statements by 14-year-old incest victim]; *Terrio* v. *McDonough* (1983) 16 Mass.App. 163 [450 N.E.2d 190, 198, 31 A.L.R.4th 943] [brief return to scene of attack to retrieve belongings]; cf. *State* v. *Mackie* (Mont. 1981) 622 P.2d 673, 676; *Perez* v. *State* (Tex.App. 1983) 653 S.W.2d 878, 882.) As a number of decisions have recognized, in such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it

---

[7]The Attorney General does not contend that the *Frye* standard is not the proper basis for determining the admissibility of the rape trauma syndrome testimony at issue in this case and—as discussed below—other state courts which have passed on the question have applied the *Frye* test. (See, e.g., *State* v. *Saldana* (Minn. 1982) 324 N.W.2d 227, 229-230; *State* v. *Marks* (1982) 231 Kan. 645 [647 P.2d 1292, 1299].) In *People* v. *Shirley* (1982) 31 Cal.3d 18, 53 [181 Cal.Rptr. 243, 641 P.2d 775], in the course of concluding that the *Frye* standard was applicable in determining the admissibility of hypnotically aided recall, we stated: "[W]e do not doubt that if testimony based on a new scientific process operating on purely psychological evidence were to be offered in our courts, it would likewise be subjected to the *Frye* standard of admissibility."

[8]As noted above, the term "rape trauma syndrome" was coined by Ann Burgess and Lynda Holmstrom in a 1974 article which reported the results of a year-long study of 146 persons who had entered the emergency ward of the Boston City Hospital "with the complaint of having been raped." (Burgess & Holmstrom, *Rape Trauma Syndrome, supra,* 131 Am.J.Psychiatry 981, 982.) The in-depth study of rape victims dates largely from the establishment of rape crisis centers in the early and mid-1970's.

may evaluate the evidence free of the constraints of popular myths. (See *Delia S., supra,* 134 Cal.App.3d at p. 478; *Middleton, supra,* 657 P.2d at pp. 1219-1220.)[9]

In the present case, however, the evidence was not admitted for any such purpose. Here, the victim promptly reported the attack, immediately exhibited the type of severe emotional reaction that the normal lay juror would associate with rape and suffered bruises and other physical injuries that corroborated her claim that she had been violently assaulted. As far as our review of the record reveals, defendant made no claim that Melanie's conduct or demeanor after the incident provided any basis for the jury to infer that she had not been raped.

Thus, in this case, the prosecution introduced the rape trauma syndrome testimony, not to rebut misconceptions about the presumed behavior of rape victims, but rather as a means of proving—from the alleged victim's post-incident trauma—that a rape in the legal sense had, in fact, occurred. Within the past few years, the highest courts of three states have addressed the propriety of using rape trauma syndrome testimony for such a purpose. In *State* v. *Saldana* (Minn. 1982) 324 N.W.2d 227, 229-230 the Minnesota Supreme Court—applying the *Frye* test—found that "[r]ape trauma syndrome is not the type of scientific test that accurately and reliably determines whether a rape has occurred" (324 N.W.2d at p. 229) and concluded that the evidence was not admissible for this purpose. Very recently, the Missouri Supreme Court reached the same result in *State* v. *Taylor* (Mo. 1984) 663 S.W.2d 235, 236-242. In *State* v. *Marks* (1982) 231 Kan. 645 [647 P.2d 1292], on the other hand, the Kansas Supreme Court—also applying the *Frye* test—came to precisely the opposite conclusion, finding that "[a]n examination of the literature clearly demonstrates that the so-called 'rape trauma syndrome' is generally accepted to be a common reaction to sexual assault" and, as such, is "relevant and admissible in a case . . . where the defense is consent." (647 P.2d at p. 1299.)[10] Amicus California Women Lawyers urge us to follow the Kansas decision, suggesting that the Califor-

---

[9]In somewhat similar vein, courts in a number of states have recently held that, in appropriate circumstances, expert testimony on the reliability of eyewitness identification should be admitted to counter some of the common misconceptions on the subject. (See, e.g., *State* v. *Chapple* (1983) 135 Ariz. 281 [660 P.2d 1208, 1220-1222]; *State* v. *Sellars* (1981) 52 N.C.App. 380 [278 S.E.2d 907, 921-922].)

[10]In *State* v. *LeBrun* (1978) 37 Ore.App. 411 [587 P.2d 1044, 1047], an intermediate appellate court in Oregon upheld the admission of testimony by a "rape victim advocate" to the effect that the victim's emotional state comported with "'what most of the women [sexual abuse victims] that come to the hospital are reacting like. . . .'" In that case, however, the *Frye* question was apparently never raised and the court simply concluded that the advocate's qualifications were sufficient to justify the trial court's decision to permit her to testify as an expert.

nia cases upholding the admissibility of expert testimony on "battered child syndrome" provide an apt analogy. (See, e.g., *People* v. *Jackson* (1971) 18 Cal.App.3d 504, 506-508 [95 Cal.Rptr. 919]; *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 408-410 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324].)

The battered child syndrome cases do provide a helpful point of reference. In *People* v. *Jackson, supra*—the first such case in California—the court explained that "[t]his syndrome means that a child has received repeated and/or serious injuries by non-accidental means . . . [T]he criteria for the 'battered child syndrome' . . . are (1) the child is usually under three years of age; (2) there is evidence of bone injury at different times; (3) there are subdural hemotomas with or without skull fractures; (4) there is a seriously injured child who does not have a history given that fits the injuries; (5) there is evidence of soft tissue injury; (6) there is evidence of neglect . . . [¶] A finding . . . of the 'battered child syndrome' . . . simply indicates that a child found with the injuries outlined above has not suffered those injuries by accidental means." (18 Cal.App.3d at pp. 506-507.)

As this description suggests, the battered child syndrome cases fall well within the mainstream of a long line of California decisions which permit an expert medical witness to give an opinion of the cause of a particular injury on the basis of the expert's deduction from the appearance of the injury itself. (See, e.g., *Perkins* v. *Sunset Tel. & Tel. Co.* (1909) 155 Cal. 712, 715 [103 P. 190]; *People* v. *Cole* (1956) 47 Cal.2d 99, 103-105 [301 P.2d 854, 56 A.L.R.2d 1435]. See generally Witkin, Cal. Evidence (2d ed. 1966) §§ 413, 414, pp. 374-376.) Amicus California Women Lawyers contends that, in like manner, a rape counselor ought to be permitted to testify to a client's postincident emotional trauma—"rape trauma syndrome"—in order to prove that a rape, in fact, occurred.

There is, however, a fundamental difference between rape trauma syndrome and both the battered child syndrome and the other scientific methods of proof that have in the past been evaluated against the *Frye* standard of reliability. Unlike fingerprints, blood tests, lie detector tests, voiceprints or the battered child syndrome,[11] rape trauma syndrome was not devised to determine the "truth" or "accuracy" of a particular past event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients

---

[11]The criteria for battered child syndrome were developed in large part in order to identify those children whose injuries were intentionally inflicted, so that steps could be taken to protect the children from additional episodes of abuse. (See generally McCoid, *The Battered Child and Other Assaults Upon the Family: Part One* (1965) 50 Minn.L.Rev. 1, 3-19.)

or patients. As the professional literature makes clear—and as the expert testimony in this case also reveals—because in the past women who have brought charges of rape have traditionally had their credibility or motives questioned by the police and others, rape counselors are taught to make a conscious effort to avoid judging the credibility of their clients. As one expert in the field recently wrote: "When a woman seeks services from a psychologist, she wants and deserves help for her problems, not judgment. *Judgment is appropriate for courtrooms, not for psychologists' offices* . . . . [¶] When a psychologist becomes judgmental, he/she has become entrapped in a major pitfall. The victim is likely to view her disclosure behavior as having been punished, to discontinue treatment and to become reluctant to seek services in the future. The obvious way to avoid this pitfall is to remember that your role is to provide services to your client, not to make a judgment about whether a 'real' rape occurred or about the victim's culpability." (Italics added.) (Kilpatrick, *Rape Victims: Detection, Assessment and Treatment* (Summer 1983) Clinical Psychologist 92, 94.)

Thus, as a rule, rape counselors do not probe inconsistencies in their clients' descriptions of the facts of the incident, nor do they conduct independent investigations to determine whether other evidence corroborates or contradicts their clients' renditions. Because their function is to help their clients deal with the trauma they are experiencing, the historical accuracy of the clients' descriptions of the details of the traumatizing events is not vital in their task. To our knowledge, all of the studies that have been conducted in this field to date have analyzed data that have been gathered through this counseling process and, as far as we are aware, none of the studies has attempted independently to verify the "truth" of the clients' recollections or to determine the legal implication of the clients' factual accounts.[12]

Because it was developed for an entirely different purpose than, for example, the battered child syndrome, rape trauma syndrome represents a distinctly different concept than the battered child diagnosis described in *Jackson.* It does not consist of a relatively narrow set of criteria or symptoms whose presence demonstrates that the client or patient has been raped; rather, as the counselor in this case testified, it is an "umbrella" concept, reflecting the broad range of emotional trauma experienced by clients of rape counselors. Although there are patterns that have been observed, the

[12]As noted earlier, under current law if a defendant reasonably and in good faith believes that the alleged victim has consented to sexual intercourse, no rape has been committed even if the woman believes in good faith that she did not consent. (See *People* v. *Mayberry, supra,* 15 Cal.3d 143; *People* v. *Guthreau, supra,* 102 Cal.App.3d 436.) In such a case, it seems reasonable to assume that although the crime of rape has not been committed, the woman's reaction will be as severe as if it had.

ongoing studies reveal that a host of variables contribute to the effect of rape on its victims; as one recent study concluded: "[c]learly, the concept of a typical rape victim has no place within the context of post rape adjustment." (McCahill et al., The Aftermath of Rape, *supra,* p. 75.)[13]

Given the history, purpose and nature of the rape trauma syndrome concept, we conclude that expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the witness was raped. We emphasize that our conclusion in this regard is not intended to suggest that rape trauma syndrome is not generally recognized or used in the general scientific community from which it arose, but only that it is not relied on in that community for the purpose for which the prosecution sought to use it in this case, namely, to prove that a rape in fact occurred. Because the literature does not even purport to claim that the syndrome is a scientifically reliable means of proving that a rape occurred, we conclude that it may not properly be used for that purpose in a criminal trial.

We hasten to add that nothing in this opinion is intended to imply that evidence of the emotional and psychological trauma that a complaining witness suffers after an alleged rape is inadmissible in a rape prosecution. As discussed in the statement of facts, in this case numerous witnesses—in addition to the rape counselor—described the severe emotional distress that Melanie exhibited both in the house immediately following the attack and in subsequent weeks, and, as defendant implicitly concedes, there is no question but that such evidence was properly received. Lay jurors are, however, fully competent to consider such evidence in determining whether a rape occurred, and "[p]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the victim was therefore raped, unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness." (*State* v. *Saldana, supra,* 324 N.W.2d at p. 230. See generally *People* v. *Arguello* (1966) 244 Cal.App.2d 413, 420-421 [53 Cal.Rptr. 245].)[14]

Accordingly, we conclude that the trial court erred in admitting the rape counselor's testimony on rape trauma syndrome. ■ The question re-

---

[13]One article explains that "[e]ach rape victim responds to and integrates the experience differently depending on her age, life situation, the circumstances of the rape, her specific personality style, and the responses of those from whom she seeks support." (Notman & Nadelson, *The Rape Victim: Psychodynamic Considerations* (1976) 133 Am.J.Psychiatry 408, 409.)

[14]Even when the expert stops short of expressing an opinion on the ultimate issue of whether the complaining witness was raped and, as here, states simply that the witness is suffering from "rape trauma syndrome," the use of this terminology is likely to mislead the jury into inferring that such a classification reflects a scientific judgment that the witness was, in fact, raped.

mains whether the error was prejudicial. We conclude that it was not. The prosecution's case against defendant was very strong. On her return from defendant's residence, Melanie immediately told her friends that she had been sexually attacked; her numerous bruises and extreme emotional distress provided persuasive corroboration of her testimony that she had not consented to the sexual encounter. Although the defense was able to cast doubt on some of Melanie's testimony, and the jury ultimately found that defendant had not used a weapon during the commission of the rape, the defense was never able to suggest any plausible, innocent explanation for Melanie's bruises and emotional trauma. Furthermore, while the rape counselor's testimony on rape trauma syndrome should not have been admitted, in truth the testimony did little more than provide the jury with information that it either already had or that was not particularly pertinent to the facts of this case.[15] In sum, we conclude that it is not reasonably probable that the erroneous admission of the expert testimony affected the judgment. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[16]

The judgment is affirmed.

Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Puglia, J.,* concurred.

---

[15]In referring to the rape counselor's testimony in its closing argument, the prosecution stated: "You heard Ms. Jacobson-Wigg testify . . . . She described what she called rape crisis syndrome trauma. Do we need to produce an expert for you to figure that out? I mean it's almost like producing an expert to come in here and tell you the sky is blue, usually, unless it's cloudy. [¶] Wouldn't you expect someone who's been subjected to this brutal, animalistic assault to have some sort of trauma, some sort of disorganization? [¶] We really didn't need her testimony, but it put a little light on things, didn't it?"

[16]In addition to his objection to the rape trauma syndrome testimony, defendant claims (1) that the trial court erred in excluding evidence of Melanie's prior sexual conduct, (2) that his trial counsel failed to provide constitutionally adequate representation, and (3) that the trial court failed to provide adequate reasons for the imposition of the upper term sentence. The Court of Appeal addressed and rejected these claims when the case was before it, and, for the reasons stated by that court, we also conclude that the contentions lack merit. (See *People* v. *Ford* (1981) 30 Cal.3d 209, 215-216 [178 Cal.Rptr. 196, 635 P.2d 1176].)

*Assigned by the Chairperson of the Judicial Council.