Filed 8/19/14  P. v Eusted CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074347 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F06187) |
| v. | |
| ROSEMARY EUSTED, | |
| Defendant and Appellant. | |

Defendant Rosemary Eusted was found guilty by a jury of 17 counts of forcible lewd acts on a child under 14 years of age (Pen. Code,[1] § 288, subd. (b)(1)) committed against M. H., her daughter, and K. H., her niece.  The jury also found that the offenses were committed against more than one victim, thereby bringing defendant within the

---

[1]    Further undesignated section references are to the Penal Code.

1

more severe sentencing provisions provided by section 667, subdivision (e)(4), the "one strike law." Defendant was sentenced to 72 years, plus 120 years to life.

On appeal, defendant contends the trial court committed prejudicial error when it: (1) denied her motion for a mistrial based upon prosecutorial misconduct; and (2) permitted evidence of child sexual abuse accommodation syndrome (the child abuse syndrome or the syndrome). We reject both contentions.

FACTUAL AND PROCEDURAL BACKGROUND

*Charged Acts Against M. H.*

M. H., 18 years old at the time of trial, testified she is the daughter of C. H. and defendant. When M. H. was three or four years old, her parents divorced and she lived primarily with defendant, but also lived with her grandmother for about one year. When M. H. was six or seven she moved back in with defendant, who was now living with Jeff H. and his daughters, A., B., C., and M.

M. H. testified that defendant's abuse of her was a daily habit. As examples of physical abuse, M. H. related that when she was about three or four years old, she was sitting in her high chair eating Oreos when defendant came into the room, picked up her from the high chair and washed her hands in "steam[ing]" water while she screamed. M. H. spent that night in the hospital because of a burn on one hand. Another time, defendant "snatched" M. H. because she was not moving fast enough and choked her until she almost passed out. M. H. went to school that day with marks on her neck and defendant told her to lie about how she got the marks. Child Protective Services (CPS) was called and M. H. lied to them as instructed by defendant. On another occasion, defendant cut M. H.'s head with her car keys, then made her stand the night against a wall, bleeding. As a result of the physical abuse, which did not stop until M. H. was 14 or 15 years old, she feared defendant.

M. H. testified that from six to nine years old, defendant also abused her sexually. The abuse consisted of several acts of the "scissors," where she was forced to intertwine

2

her legs with defendant's legs and they would rub their vaginas together. About three to four times a week, defendant forced M. H. into acts of oral copulation. On one occasion defendant made M. H. put a condom over her hand and insert it into defendant's vagina and move it back and forth.

At one point when defendant was being investigated for child abuse of Jeff H.'s children, defendant forced M. H. to sign a letter defendant had written denying any abuse and proclaiming defendant to be a good mother.

The sexual abuse of M. H. ended when she was "nine, almost ten," and defendant became pregnant. Defendant kicked M. H. out of the house when M. H. was 15 years old. M. H. finally disclosed the abuse because she did not want to go back living with defendant.

*Charged Acts Against K. H.*

K. H. is defendant's niece and was 22 years old at the time of trial. From two to 18 years of age, K. H. lived with her grandmother in Clarksburg and defendant was a regular visitor. Defendant began sexually abusing K. H. when she was about seven years old and continued to do so until she was 13. The abuse consisted of K. H. fondling defendant's breasts and vagina, forcing her to orally copulate defendant, and on more than one occasion, placing the handle of a hairbrush in K. H.'s vagina. K. H. was afraid of defendant because she threatened to take her out of her grandmother's home and kill her if she told of the molestations.

At K. H.'s grandmother's insistence, K. H. and other grandchildren were forced to write letters lauding defendant's care of them. K. H. testified that none of what she wrote was true.

*Uncharged Acts*

Jeff H.'s daughters B., C., and M., each testified to defendant's sexually molesting them. B. was 22 years old at trial and said that defendant made her rub defendant's vaginal area and breasts, defendant inserted her fingers and a dildo in B.'s vagina, and

3

she orally copulated B. C., who was 20 years old at trial, testified that defendant touched C.'s vaginal area, placed her fingers inside C.'s vagina and between C.'s legs, and warned C. not to tell anyone what she had done. M., who was 16 years old at trial, testified that when she was about six years old, defendant rubbed her vaginal area one or two times and kissed her on the mouth.

*Expert Testimony*

Dr. Anthony Urquiza, a licensed psychologist and expert in child abuse syndrome testified that discussion of the syndrome is an educational tool to disabuse those professionally dealing with child abuse and others of the belief that an abused child's failure to report the abuse or to attempt to fight off the abuser is an indication that the abuse did not happen. Discussion of the syndrome is not meant to diagnose whether a child has actually been abused. The child may keep the abuse secret because the child was verbally intimidated, the child may like the abuser and understand that something bad will happen to the abuser if the child tells, and the child fears that reporting the abuse may bring humiliation, shame, and embarrassment upon them. The child may also remain silent because the abuser is larger and stronger and the child is helpless to fight off the abuser. The child may feel trapped and learn to cope with the abuse by pretending to be asleep or otherwise disassociating with the reality of the abuse, which permits a child to go about his or her daily life. The child's delayed disclosure addresses the often held perception that an abused child will tell of the abuse right away, when in fact that is not the case.

*Defense Testimony*

Several witnesses who had spent considerable time living with or visiting defendant when she was in the company of M. H. and K. H., testified they never saw defendant physically or sexually abuse either girl.

4

DISCUSSION

I

*Alleged Prosecutorial Misconduct*

Defendant contends the trial court prejudicially erred when it denied her motion for a mistrial based upon the prosecutor's misconduct made during her opening statement. The People respond that review of any error has been forfeited by defendant's failure to timely object and, in any event, the error was harmless. We disagree the issue was forfeited, but agree the error was harmless.

Prior to trial, the People sought to have admitted testimony from Donald Davis, defendant's estranged husband, that he met defendant on a dating Web site and that she "would expose her unclothed body parts to him via webcam and would masturbate herself in front of the camera for sexual arousal . . . for the two of them." The court ruled the evidence was inadmissible because it involved legal sexual activity between consenting adults, there was no showing that children were present to see the exposure, and the evidence ran the risk of potentially distracting the jurors because it was "somewhat salacious."

During the prosecutor's opening statement, she stated: "[Defendant's] husband, Donald Davis, has been called. He's going to be traveling from New Orleans and he was in possession of her computer. And you'll hear that the computer was analyzed and several photographs of the defendant were pulled from the computer that would support the evidence that came from both [M. H.] and [K. H.] that defendant was using the webcam in her room at various times for what would be interpreted as sexual behavior. [¶] Mr. Davis will tell you he met [defendant] on FUBAR, which is an adult social networking website. And that when he met her she would flash herself in front the computer and masturbate engaging-- [¶] Excuse me."

At this point, the prosecutor was given permission to approach the bench where she, defense counsel, and the court engaged in an unreported conversation. The

prosecutor then finished her opening statement and the court excused the jury. The court put on the record that the reason for the sidebar was that the prosecutor believed she had violated the trial court's order prohibiting mentioning that defendant had engaged in Internet sex with Davis, including masturbating to arouse him. Defendant's counsel stated while he did not believe the prosecutor's error was purposeful, nevertheless the jury had been tainted by learning of it and, therefore, a new trial was necessary.

The court denied the motion, concluding there was no prejudice because the acts referred to, although perhaps distasteful, were not unlawful and the matter could be resolved by instructing the jury to disregard that part of the prosecutor's opening statement.

When the jury returned, the court addressed the issue: "I'm going to admonish you with regard to a portion of [the prosecutor]'s opening statement. She made reference in her opening statement to sexual activity by the defendant on a webcam without any of the alleged victims being present at the time. Such conduct is lawful, therefore, it is not conduct that should be essentially considered by you in any way as you consider this case. [¶] I think specifically [the prosecutor] made comments with regard to two incidents of that type. So I'm going to order that all of you disregard that. It is not relevant to this case." The court then queried the jurors and alternates on whether they could follow the instruction and they responded affirmatively.

Defendant argues that "[t]he prosecutor's misconduct was so prejudicial that no admonition could cure it, thus [defendant] was denied a fair trial." The People claim defendant's failure to object and request an admonition by the court forfeits the issue for appeal, and, in any event, the admonition later provided by the court rendered the error harmless.

"[T]he reason for the forfeiture rule is that '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court,

6

could have been easily corrected or avoided.' " (*People v. Collins* (2010) 49 Cal.4th 175, 226-227.)

Here, the prosecutor immediately brought her own misconduct to the court's attention when it occurred, requested a sidebar discussion, and the matter was dealt with after the prosecutor finished her opening statement. It matters not that it was the prosecutor who brought the error to the attention of the court, the critical point is that the court was made aware of the potential misconduct issue and had the opportunity to correct it. Accordingly, the issue is not forfeited.

"A motion for mistrial should be granted ' "only when a party's chances of receiving a fair trial have been irreparably damaged." ' [Citation.] Whether a particular incident is so prejudicial that it warrants a mistrial 'requires a nuanced, fact-based analysis,' which is best performed by the trial court. [Citation.] We review the trial court's order denying a motion for mistrial under the deferential abuse of discretion standard. [Citation.] 'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

Here, the trial court properly analyzed the effect of the prosecutor's error. One brief comment about defendant flashing her breasts and masturbating before a webcam to arouse herself and her husband sexually, while perhaps distasteful, was not the type of incident reasonably likely to inflame the passions of the jurors to the point they would be unable to follow the court's instruction to not consider the comment in determining defendant's guilt. Indeed, the sexual conduct referred to by the prosecutor in her opening statement pales into insignificance when compared to the sexual conduct described by the five children upon whom that conduct was forced. In the absence of any showing to the contrary, we presume that the jury followed the court's instructions. (*People v. Pearson*

7

(2013) 56 Cal.4th 393, 477.)  Defendant has not, and cannot, make the required showing.  Accordingly, the contention is rejected.

Defendant also argues "[t]he denial of the motion for a mistrial was prejudicial" is shown by the evidence thereafter admitted during the trial.  The evidence produced at trial was not before the trial court when defendant made, and the trial court denied, her mistrial motion.  If defendant believed the evidence produced at trial demonstrates that the mistrial motion should have been granted, the appropriate means for testing that belief is for her to make a motion for a new trial where the issue could be fully explored by both parties, but she did not do so.  Accordingly, this belated argument for prejudice is not available for appellate review.

Defendant cites *People v. Kelley* (1967) 66 Cal.2d 232; *People of the Territory of Guam v. Shymanovitz* (9th Cir. 1998) 157 F.3d 1154; *Ward v. Dretke* (5th Cir. 2005) 420 F.3d 479; and *U. S. v. Miller* (3d Cir. 2008) 527 F.3d 54, as examples where judgments were reversed because the trial court wrongfully admitted sexual evidence.  These cases are not on point.  Here, the court did not admit the challenged sexual evidence, rather the court excluded it and instructed the jurors that the prosecutor's comments were not evidence and the jurors were not to consider those comments in determining defendant's guilt or innocence.

II

*Testimony On Child Abuse Accommodation Syndrome*

Prior to trial, the People sought to have evidence of the syndrome admitted through the testimony of Dr. Urquiza.  Over counsel's objection, the court permitted Dr. Urquiza to testify , but limited his discussion of the syndrome to "letting jurors know that not everyone always reports simultaneously with the incident [of sexual abuse]." The court expressly agreed with the prosecutor that the testimony cannot make any

8

"specific reference to any facts in this case." Dr. Urquiza testified to evidence of the syndrome as described above.[2]

Defendant contends that admission of this evidence was error because the evidence constitutes an "improper, irrelevant expert opinion which usurps the jury's function to determine credibility." The evidence is neither improper nor irrelevant.

In *People v. Bledsoe* (1984) 36 Cal.3d 236, the Supreme Court concluded that expert testimony regarding "rape trauma syndrome" was not sufficiently reliable to be admissible as proof the complaining witness was in fact raped. (*Id.* at p. 251.) Even so, *Bledsoe* suggested that evidence of the syndrome could "play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at pp. 247-248.)

Relying on the reasoning of *Bledsoe*, the appellate court in *People v. Bowker* (1988) 203 Cal.App.3d 385 found evidence of the syndrome inapplicable in determining whether child abuse had in fact occurred, but it could be admitted solely to dispel common misconceptions the jury may hold regarding how abused children react to the abuse, such as a delay reporting the abuse. (*Id.* at pp. 393-394.) However, the jury must be instructed on the limited use of the evidence. (*Id.* at p. 394.)

In the instant case, defense counsel elicited from M. H. that when she had the opportunity, she had not reported the sexual abuse to CPS or to law enforcement officers. Similarly, counsel elicited from K. H. that during the times when she spoke with law enforcement she did not tell them of the sexual abuse. During closing argument, counsel

---

**2** As to the use of Dr. Urquiza's testimony, the court instructed the jury: "You may consider this evidence only in deciding whether or not [M]. H. and [K]. H.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

pointed out to the jury that it should consider these delays in determining the credibility of M. H. and K. H.

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Since the evidence of the syndrome pointed out to the jury that a child's failure or delay in reporting abuse was not unusual conduct for a child who had been abused, it was relevant to offset defense counsel's implied suggestion to the contrary. Accordingly, the evidence was relevant and proper in assisting the jury in determining the credibility of the victims.

Defendant contends that because "[t]he premise underlying Bledsoe and its progeny is no longer valid," the reason for allowing evidence such as that of the syndrome no longer exists. Whatever may be said for defendant's position, and it is not much, *Bledsoe* is a California Supreme Court case and until its reasoning is retracted or overruled, we are bound to follow it. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Relying on out-of-state cases and journals, defendant contends the syndrome does not have general acceptance in the scientific community. Specifically, defendant states that it "has been rejected as a diagnosis by the American Psychiatric Association and Statistical Manual . . . ," and, citing various authorities, claims the syndrome has been "rejected by the relevant scientific community as a diagnostic tool for making child sexual abuse determinations."

That such evidence is not accepted as a diagnostic tool is utterly irrelevant in this case for the simple reason that the evidence was not offered to prove the sexual abuse charges were true. The evidence was offered to assist the jury in evaluating the credibility of M. H. and K. H. against the potential misconception that delayed reporting of abuse makes it less likely that such abuse occurred, a clearly proper purpose. (See

10

*People v. McAlpin* (1991) 53 Cal.3d 1289.) In *McAlpin*, the Supreme Court observed, with implied approval, that several Courts of Appeal have held that evidence of the syndrome is "admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident--e.g., a delay in reporting--is inconsistent with his or her testimony claiming molestation." (*Id.* at pp. 1300-1301.) As we have already noted, defense counsel did suggest that M. H.'s and K. H.'s delay in reporting the sexual assaults was reason to doubt the truth that the assaults had occurred.

Finally, relying on *Commonwealth v. Dunkle* (1992) 529 Pa. 168, defendant claims the evidence of the syndrome "does not meet the requirement that it be beyond the common knowledge of the jury in order to be admissible as expert testimony," because the reasons for a child's delay in reporting abuse is well within the common knowledge of the jurors and there is no need for expert testimony. We are unpersuaded. As to the need for an expert witness to testify to the reasons for a child's delay in reporting sexual abuse, the court in *Dunkle* held: "In the final analysis, the reason for the delay must be ascertained by the jury and is based on the credibility of the child and the attendant circumstance of each case. We believe that the evidence presented through the fact witnesses, coupled with an instruction to the jury that it should consider the reasons why the child did not come forward, including the age and circumstances of the child in the case, are sufficient to provide the jury with enough guidance to make a determination of the importance of prompt complaint in each case. Not only is there no need for testimony about the reasons children may not come forward, but permitting it would infringe on the jury's right to determine credibility." (*Id.* at p. 837, fn. omitted.)

Notwithstanding the Pennsylvania Supreme Court's view in *Dunkle*, the California Supreme Court has taken a contrary view. In *People v. McAlpin*, *supra*, 53 Cal.3d at pages 1300-1301, the court held that while "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when

11

the defendant suggests that the child's conduct after the incident--e.g., a delay in reporting--is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " Accordingly, the evidence of the syndrome was properly admitted.

## DISPOSITION

The judgment is affirmed.


                                                                    ROBIE            , J.


We concur:



        BLEASE          , Acting P. J.



        DUARTE          , J.


12