Filed 5/2/22  P. v. Zambrana-Aleman CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

DIXON ZAMBRANA-ALEMAN,

    Defendant and Appellant.

</td><td>

A161473

(San Francisco County
Super. Ct. No. 232307)

</td></tr>
</table>

A jury convicted defendant and appellant Dixon Zambrana-Aleman of child molestation and multiple related offenses.  He contends the court violated *Kelly-Frye*[1] when it admitted expert testimony about the Child Sexual Abuse Accommodation Syndrome (CSAAS), and that the court erred when it allowed the expert to "vouch" for the victim's credibility and denied his motion for new trial based on juror misconduct.  Appellant's arguments are meritless, so we affirm the judgment.

## BACKGROUND

The following summary of the evidence focuses on the issues raised on appeal and is not meant to be exhaustive.  We reference additional testimony as necessary in our discussion section, *post*.

---

[1] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

Zambrana-Aleman began dating Samantha's mother, Jacqueline, when Samantha was four or five years old. He moved in when Samantha was seven or eight and moved out when his relationship with Jacqueline ended in July 2019; Samantha was 20. From age 10 or 11 until May 2019, Zambrana-Aleman subjected Samantha to various acts of sexual abuse.[2]

At trial, Samantha testified that, starting when she was around 12, she would sometimes wake up late at night to find Zambrana-Aleman in her bedroom touching her breasts, buttocks, and vagina. She started wearing multiple layers of t-shirts and sweatshirts, a bra, underwear, and sweatpants with a double or triple knotted drawstring to bed, but, even so, she sometimes woke up to find her clothing and bedding had been disturbed. Samantha did not tell anyone about the abuse because Zambrana-Aleman told her not to; she was afraid; she feared nobody would believe her; and she did not want her little sisters to hate her "for being the reason their dad went away."[3] Moreover, Samantha had witnessed Zambrana-Aleman threaten and hit her mother and feared he would use physical force against her if she resisted.[4] Samantha's fear increased with each incident of abuse.

Samantha tried to make her relationship with Zambrana-Aleman seem as normal as possible when they were around other people, and from an

---

[2] We refer to Samantha and her mother by their first names to preserve their privacy; we intend no disrespect.

[3] Zambrana-Aleman and Jacqueline had three additional daughters together. Samantha shared a room with bunk beds with at least one and sometimes all of her half sisters.

[4] The trial court instructed the jury that it could use Samantha's testimony about Zambrana-Aleman's interactions with her mother only for purposes of assessing (1) why Samantha delayed her disclosure of the sexual abuse, and (2) "whether this was force, fear or duress in play when Samantha complied with the defendant's demands as alleged in this case."

2

outsider's perspective they had a relatively normal relationship. At home, however, she tried to keep her distance from him to the extent possible.

On about five occasions over the years, in the middle of the night when the girls were sleeping, Jacqueline discovered Zambrana-Aleman in the bedroom Samantha shared with her sisters. He would jump, startled, when she turned on the light. When she asked what he was doing, he would say he was arranging the children's blankets or give some other excuse. On one occasion Zambrana-Aleman ran from the room and into the bathroom when Jacqueline turned on the light. Jacqueline saw that Samantha's blanket had been removed. When she asked what he had been doing in the girls' room, Zambrana-Aleman acted nervous and responded, "Are you fucking stupid? What do you think? What would I be doing?"

Jacqueline asked Samantha whether Zambrana-Aleman had touched her inappropriately "[a] lot of times," starting when Samantha was a young girl. Samantha would say "no" and stay quiet. In the summer of 2019 Jacqueline and Zambrana-Aleman ended their relationship, and Zambrana-Aleman moved out. Not long afterward, Samantha disclosed the abuse to Jacqueline for the first time. Two days later they reported it to the police. Samantha waited those two days out of concern that reporting the abuse would interfere with her ongoing efforts to become a police officer.

Zambrana-Aleman was convicted by jury of seven of eight charged offenses: committing a forcible lewd act upon a child under 14 years old; continuous sexual abuse of a child under 14 years old; committing a lewd act upon a child aged 14 or 15 by a person at least 10 years older; child molest; assault with attempt to commit rape; attempted rape of an unconscious woman; and attempted rape by force. He was acquitted of misdemeanor peeking. The court imposed an aggregate prison term of 28 years.

This timely appeal followed the denial of Zambrana-Aleman's motion for a new trial.

## DISCUSSION

### I. CSAAS Evidence

#### A. *Background*

The People moved in limine to admit expert CSAAS testimony, including testimony on the effect of trauma on memory and the connection between child sexual abuse and delayed disclosure, to assist the jury in evaluating Samantha's credibility.[5]  Zambrana-Aleman moved to exclude CSAAS evidence as inherently unreliable, irrelevant, and unduly prejudicial and to require the prosecution to identify any myths or misconceptions it intended the expert testimony to dispel if the testimony were admitted.  In the event the court declined to exclude the CSAAS evidence outright, Zambrana-Aleman requested a *Kelly-Frye* hearing into its continued validity.  After argument, the court ruled that *Kelly-Frye* was inapplicable but ordered an Evidence Code section 402 (section 402) hearing to "understand exactly what myths are to be debunked."

#### 1. *The Section 402 Hearing*

The section 402 hearing was held near the end of the prosecution's case-in-chief.  The prosecutor called Dr. Stefanie Smith, Ph.D., as the CSAAS expert.  Dr. Smith is a clinical psychologist specializing in trauma and child maltreatment.  She identified a number of common characteristics of child sexual abuse victims, including issues with trust; attempts to appear unattractive; delayed disclosure, nondisclosure, and denial of the abuse;

---

[5] Although the expert witness did not explicitly refer to CSAAS or describe such behaviors as a "syndrome," the record shows the syndrome was the subject of the proposed testimony.

behavioral changes, such as becoming angry or withdrawn; attentional and memory problems; and shame.

Dr. Smith testified that sexually abused children commonly do not disclose the abuse because they think they will not be believed or will get in trouble. They may confuse the abuser's actions with how adults demonstrate love and care and therefore fail to understand they are being abused. Abused children may also keep quiet out of worry about what might happen if they are not believed or the effects on a non-abusing parent if the abuser leaves. They may be ashamed and feel the abuse was their fault. Having observed domestic violence between the perpetrator and a non-abusive parent can also contribute to a sexually abused child's delayed or nondisclosure of the abuse.

The trial court ruled the CSAAS testimony was admissible but limited it in large part to testimony about delayed disclosure of child sexual abuse and various related factors, including children's worries about being disbelieved or rejected and the effect on the non-abusive parent; their exposure to domestic violence between the parents; and shame. The court also permitted Dr. Smith to testify about typical triggers of disclosure, such as the abuser leaving the home; myths about children's ability to protect themselves; and memory issues and dissociation. However, the court barred Dr. Smith from testifying about whether there are certain hallmark behaviors of child sexual abuse and "whether sexual abuse can be determined based solely on looking at the victim's behavior," with the qualification that testimony about the child's manner of dressing could be admissible in the context of delayed disclosure and how abused children try to protect themselves.

## 2. Trial

At trial, Dr. Smith testified that she did not meet, interview, or treat Samantha but had reviewed her preliminary hearing testimony, the initial police report, and a recording of the investigation by the special victim's unit.

Dr. Smith testified that ongoing sexual abuse can alter a child's brain development, affecting cognitive processes, memory, and the ability to recount a chronologically cohesive memory. The power dynamic between child and adult plays a role in a child's compliance during the abuse and promotes secrecy and delayed disclosure. Common reasons a child may not immediately disclose sexual abuse include the fear of getting in trouble or being disbelieved, a desire to protect the non-abusive caregiver or even the abuser, and fear of rejection if the non-abusing parent sides with the abuser over the child. Children may also try to protect themselves by making themselves "inaccessible" in other ways, such as sleeping with a teddy bear, wearing clothes that are difficult to remove, or trying to appear less attractive.

Dr. Smith testified about the impact of "betrayal trauma," which occurs when an abuser is someone the victim depends on for love and protection. In that situation the child may come to believe that neither the people around them nor authority figures such as their teacher, doctor, or police will believe them. Children are less likely to disclose sexual abuse if they have witnessed domestic violence against the non-abusing parent. Even when asked directly, a child may deny the abuse to protect the abuser or from fear of retribution. Moreover, as children become teenagers they are likely to feel they will not be believed because they did not come forward earlier. Disclosure often occurs when the abuser leaves the household, the abuse escalates, the child's

6

distress becomes overwhelming, or the child becomes older and realizes their caregiver's actions were abuse.

The prosecutor argued in closing that the purpose of Dr. Smith's testimony was "to help you understand Samantha's trauma, how people react to trauma, the [e]ffects of trauma on the brain and the body," and related the expert testimony about non- and delayed disclosure to Samantha's testimony. The defense emphasized that "all you are going to do with Dr. Smith is say, okay, the delayed reporting alone does not make me discredit Samantha's testimony. There is no other purpose for that testimony."

The court instructed the jurors: "You have heard testimony from Dr. Stefanie Smith regarding trauma psychology and the effects of child sexual abuse on the brain and body. [¶] Dr. Stefanie Smith's testimony is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Samantha's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [her] testimony."

## B.     *Kelly-Frye*

Zambrana-Aleman contends the court erred by admitting Dr. Smith's testimony without subjecting it to *Kelly-Frye* analysis. Although he concedes that California authority is against him, he urges us to reexamine longstanding precedent in light of "new scientific evidence that [CSAAS] is junk science." He asks that we follow a small minority of other jurisdictions that have rejected or narrowed the use of CSAAS evidence and remand his case for "a *Kelly-Frye* hearing into the continued reliability of CSAAS evidence, if it was ever reliable at all." The argument is meritless.

Under the *Kelly-Frye* test, when a party offers expert testimony based on a new scientific technique the proponent must establish the reliability of

7

the method by showing the procedure has been generally accepted in the relevant scientific community. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448 (*Harlan*).) "The *Kelly* standard provides a framework within which courts can analyze the reliability of expert testimony based on new or novel scientific methods or techniques." (*People v. Lucas* (2014) 60 Cal.4th 153, 223–224, disapproved on another point in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19; *People v. Jackson* (2016) 1 Cal.5th 269, 316 [" '*Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' "].)

CSAAS evidence is not "new or novel" scientific evidence for purposes of *Kelly-Frye*. (*People v. Lucas, supra,* 60 Cal.4th at pp. 223–224.) To the contrary, as appellant acknowledges, over the past 30 years California courts have widely held such expert testimony is not subject to *Kelly-Frye* analysis when it is not offered as proof that a molestation occurred, but rather to rehabilitate a child's credibility when it is suggested the child's conduct after the incident is inconsistent with having been abused. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 & fn. 4 (*McAlpin*) [citing collected cases]; *People v. Gray* (1986) 187 Cal.App.3d 213, 219–220 (*Gray*); *Harlan, supra,* 222 Cal.3d at pp. 448–449; *People v. Wells* (2004) 118 Cal.App.4th 179 (*Wells*).) Thus, as observed in *Wells*, at page 188, CSAAS testimony is admissible " 'for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation' " and "must be tailored to address the specific myth or misconception suggested by the evidence."

Appellant argues that even this tailored type of CSAAS testimony violates due process and should be subject to *Kelley-Frye* analysis. But the non-California cases cited are not so broad or clear as appellant suggests.

8

For example, in *Sanderson v. Commonwealth* (Ky. 2009) 291 S.W.3d. 610, the scope of the CSAAS expert testimony exceeded the limitations required in Kentucky as well as the scope of the testimony offered here. The *Sanderson* expert veered out of bounds when she testified as to "generic characteristics of child sex abuse victims," improperly suggesting that children who are similarly abused "might also develop the same symptoms or traits." (*Sanderson*, at p. 614.) In response to questioning by the prosecution, the CSAAS expert went on to suggest that "these 'symptoms' are what cause sexually abused children to become prostitutes." (*Ibid.*) The *Sanderson* court understandably found this to be "the exact type of generic and unreliable evidence this Court has repeatedly held to be reversible error." (*Ibid.*) But it did not issue a blanket rule that CSAAS testimony is inadmissible, nor did it require *Kelley-Frye* analysis.

The distinction in *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557 is even more striking where testimony of posttraumatic stress syndrome (rather than CSAAS), was offered to prove the alleged victim had been sexually assaulted. The testifying expert stated that the four children he had examined "exhibited 'symptom constellations' consistent with post-traumatic stress syndrome and that, in his opinion, the 'stressor' precipitating the syndrome in the children was sexual abuse." (*Ballard*, at p. 561.) Where the prosecution "advanced no evidence at trial that the facts underlying Dr. Luscomb's testimony were of a type reasonably relied on by experts in the particular field, [citation] or that it is possible to make a statement that sexually abused children will exhibit the same characteristics or traits," this expert testimony invaded "the province of the jury to decide on the creditability of witnesses" and was error. (*Id.* at p. 562.)

9

In *State v. Foret* (La. 1993) 628 So.2d 1116, 1125, the Louisiana Supreme Court recognized the distinction between CSAAS testimony used "appropriately in court testimony not to prove a child was molested but to rebut the myths which prejudice endorsement of delayed or inconsistent disclosure" as compared to CSAAS used "as a diagnostic tool to show to a court that sexual abuse has indeed occurred." The *Foret* court explained that the "proper presentation" of CSAAS testimony must focus on explaining why " 'superficially bizarre' " reactions such as delayed reporting take place. (*Id.* at p. 1130.) They must use "general terms" to explain "the behavioral characteristics of child abuse victims in disclosing alleged incidents" without giving direct testimony " 'concerning the particular victim's credibility.' " (*Ibid.*) Presented in that form, the testimony will not substitute the expert's " 'estimation of credibility for that of the jury. Rather, it is to provide a scientific perspective for the jury according to which it can evaluate the complainant's testimony for itself.' " (*Ibid.*) Because the *Foret* expert testimony did not follow these standards and instead was proffered to intentionally bolster the testimony of the victim, it was error. (*Id.* at pp. 1130–1131.)

Performing a similar analysis in California, *Gray, supra,* 187 Cal.App.3d 213, is instructive. Drawing and developing on the Supreme Court's discussion of "rape trauma syndrome" evidence in *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), the *Gray* court observed that CSAAS evidence is more akin to expert testimony informing the jury of certain factors that may affect eyewitness identification—which is not subject to the *Kelly-Frye* test—than to " 'scientific evidence . . . derived from an apparently "scientific" mechanism, instrument, or procedure." (*Gray,* at p. 219.) Moreover, " '[w]e have never applied the *Kelly-Frye* rule to expert medical testimony, even

10

when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association.' " (*Id.* at p. 220.)  Applying the Supreme Court's reasoning in *People v. McDonald* (1984) 37 Cal.3d 351, 372 (holding *Kelly-Frye* does not apply to expert testimony on eyewitness identification), the *Gray* court held that general testimony about traits and characteristics of child victims of molestation as a class does not fall into the category of scientific evidence for purposes of *Kelly-Frye* when introduced for the limited purpose of rebutting a suggestion that a child's behavior is inconsistent with abuse.  (*Gray,* at p. 220.)

Since *Gray*, California courts have consistently authorized the admission of CSAAS evidence to disabuse a jury's possible misconceptions about a child's reaction to and reporting of sexual abuse without need for analysis under *Kelly-Frye.*  (See, e.g., *People v. Munch* (2020) 52 Cal.App.5th 464, 468–470 [expressly rejecting minority out-of-state view]; *Harlan, supra,* 222 Cal.App.3d at pp. 448–450; *Wells, supra,* 118 Cal.App.4th 179, 188–190; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 954–956; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 734–735; cf. *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1099–1100; *People v. Bowker* (1988) 203 Cal.App.3d 385, 391–394.)

The Supreme Court has also signaled its agreement with these cases. In *McAlpin, supra,* 53 Cal.3d 1289, the court held a police officer could properly testify that it is not unusual for parents to refrain from reporting a known molestation of their child.  (*Id.* at pp. 1300–1301.)  The court noted its recognition in *People v. Bledsoe, supra,* 36 Cal.3d 236, that expert testimony

11

on rape trauma syndrome, although inadmissible to prove the complaining witness had been raped, is admissible to rehabilitate her when the defense impeaches by suggesting her post-incident conduct was inconsistent with having been raped. "[I]n such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at pp. 247–248.)

In the court's view, expert testimony on CSAAS provides "[a]n even more direct analogy." (*McAlpin, supra,* 53 Cal.3d at p. 1300.) "In a series of decisions the Courts of Appeal have extended to this context both the rule and the exception of *People v. Bledsoe, supra,* 36 Cal.3d 236, i.e., expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin,* at p. 1300.) Although the case before it concerned the failure of the parent, rather than the child, to report abuse, the court held the rule developed in the context of CSAAS was equally applicable. (*Id.* at p. 1301.)

More recently, the court cited *McAlpin* with approval in *People v. Brown* (2004) 33 Cal.4th 892, 905–906, when it extended the same principles to expert testimony about the common behaviors of domestic violence victims. Zambrana-Aleman suggests the court's endorsement of CSAAS evidence in *McAlpin* and *Brown* is dictum because neither case squarely presented the admissibility of such evidence under the *Kelly-Frye* test. But not all dicta are created equal. "When the Supreme Court has conducted a thorough analysis

12

of the issues and such analysis reflects compelling logic, its dictum should be followed." (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169; see *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 925 ["Even if the court's conclusions technically constitute dicta, we will not reject dicta of the Supreme Court without a compelling reason"]; *Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 297 [the dictum of the Supreme Court "while not controlling authority, carries persuasive weight and should be followed where it demonstrates a thorough analysis of the issue or reflects compelling logic"].)

We cannot say the Supreme Court's analysis of CSAAS evidence in *McAlpin* and *Brown* was " 'inadvertent, ill-considered or a matter lightly to be disregarded.' " (*Hubbard, supra,* 66 Cal.App.4th at p. 1169.) Moreover, the rule first articulated in *Gray* has been consistently followed for over 30 years. In these circumstances, "[w]hether the Supreme Court's obvious awareness of the consequences of its statement elevates the dictum to a holding or whether it is a dictum that we must follow, does not make much difference. We follow." (*People v. Trice* (1977) 75 Cal.App.3d 984, 986–987.) We accordingly decline Zambrana-Aleman's demand to depart from precedent in favor of a handful of out-of-state authorities and professional articles that criticize the continued validity of CSAAS evidence. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

These conclusions also lead us to reject Zambrana-Aleman's related assertion of a due process violation. Dr. Smith's testimony does not cross the boundaries set forth within or outside California case law. The trial court specifically prohibited the use of CSAAS testimony to show "whether sexual abuse can be determined based solely on looking at the victim's behavior" and focused the testimony on the context of delayed disclosure and how abused

13

children try to protect themselves. Dr. Smith's trial testimony followed these parameters, focusing on the situational dynamics that may impact the timing and manner of disclosure of sexual abuse. While Dr. Smith did acknowledge reading the preliminary examination transcript and the victim's statements, she did not testify or opine about the victim herself. The only questions about any potential "diagnosis" and related symptoms came from defense counsel and were answered in the abstract with the court's permission. The testimony in this form was properly admitted to explain Samantha's initial denials of the abuse and her delayed disclosure and did not violate Zambrana-Aleman's constitutional right to a fair trial. (See *People v. Patino*, *supra*, 26 Cal.App.4th at p. 1747 ["introduction of CSAAS testimony does not by itself deny appellant due process"].)

## C. *Improper "Vouching"*

Alternatively, Zambrana-Aleman contends the court should have excluded the CSAAS testimony as unduly prejudicial pursuant to Evidence Code section 352 because Dr. Smith improperly "vouched" for Samantha's truthfulness when she testified that she "reviewed all the facts of the case" and then "provided testimony verifying the key aspects of Samantha's testimony."[6] Therefore, he maintains, "[a] reasonable juror could only conclude[] that Dr. Smith was opining in her capacity as an expert, that Samantha was telling the truth and that [he] was guilty."

---

[6] Zambrana-Aleman's sole record support for his claim of "vouching" is Dr. Smith's testimony that she "reviewed the transcript of the preliminary— preliminary hearing specific to Samantha's testimony, and I reviewed the audio recording of the investigation by the special victim's unit. And then I reviewed the report of—the initial police officers['] report, the initial police on the scene."

Neither the record nor common sense supports this claim. However, we need not decide the point because it was forfeited by Zambrana-Aleman's failure to object when Smith testified about her review of Samantha's testimony and portions of her case file. "Under Evidence Code section 353, subdivision (a), a reviewing court cannot grant relief on a claim that evidence was erroneously admitted unless a timely objection was made 'and so stated as to make clear the specific ground of the objection or motion.' ' "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." ' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1214, disapproved on another point by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) While Zambrana-Aleman contends an objection would have been futile because the court had already addressed the admissibility of CSAAS evidence at the section 402 hearing (see *People v. Tuggles* (2009) 179 Cal.App.4th 339, 356 [failure to make futile objection does not forfeit issue for appeal]), nothing in the record indicates how the court would have ruled on the "vouching" objection now raised for the first time on appeal.

## II.    Juror Misconduct

Zambrana-Aleman asserts the trial court abused its discretion when it denied his new trial motion without conducting an evidentiary hearing to evaluate his allegations of juror misconduct. Here too, we disagree.

### A.    *Background*

Following his conviction, Zambrana-Aleman moved for a new trial based on a juror's alleged misconduct in concealing relevant information during voir dire. According to defense counsel's supporting declaration,

15

counsel interviewed two jurors after trial and asked how they reconciled Samantha's testimony that she was abused every night for a decade in a crowded household with the fact that no one ever witnessed or suspected abuse. Both jurors responded that the jury had considered the possibility the abuse never happened but eventually concluded that Samantha's mother must have been in denial. They explained that another juror[7] had disclosed that a family member had been sexually abused throughout his childhood but that, even though there were always people around, none of his family members were aware of the abuse until he disclosed it as an adult. After hearing this story, the two jurors came to believe it was not unreasonable that Samantha's abuse may have gone undetected.

The defense investigator spoke with Juror No. 2 and provided a declaration describing their conversation. Juror No. 2 said her brother-in-law had been molested for many years without anyone knowing, and that his experience had shaped her own sense of the present case. Juror No. 2 "shared this story during deliberations 'to show that things can happen behind closed doors.' " She told the investigator that she believed she had disclosed her brother-in-law's experience in her juror questionnaire. The investigator prepared a statement for Juror No.2's signature, but the juror declined to sign it.

Zambrana-Aleman also submitted Juror No. 2's juror questionnaire. One question asked, "Have you, or anyone close to you, ever been sexually molested as a child? This includes attempted molestation by a stranger, acquaintance or family member." Juror No. 2 answered "no." Another

---

[7] For clarity, we will adopt Zambrana-Aleman's convention of referring to this juror as Juror No. 2.

question stated Zambrana-Aleman was accused of committing continuous sexual abuse of his stepdaughter from ages 10 or 11 through 20 and asked, "[D]o you believe you will have an emotional or other reaction when you hear the evidence that may prevent you from being a fair and impartial juror in this case?" Juror No. 2 wrote, "Such charges sound horrific. I can, however, listen to & weigh the evidence."

Zambrana-Aleman argued Juror No. 2's failure to disclose her brother-in-law's experience on the questionnaire or in voir dire was prejudicial misconduct or, alternatively, required an evidentiary hearing at which the juror could be subpoenaed to testify. In opposition, the prosecutor argued the defense declarations contained inadmissible hearsay and impermissibly described the jury's decisionmaking processes. On the merits, the prosecutor argued there was no evidence regarding the nature of Juror No. 2's relationship with her brother-in-law and, given that the questionnaire did not define "close," she "may not have considered her brother-in-law given the phrasing of the question itself." The nondisclosure was thus unintentional and did not establish misconduct or bias.

The trial court accepted the declarations as an offer of proof and declined to strike them on hearsay grounds but struck substantial portions that discussed the jurors' thought processes. From defense counsel's declaration, the court struck paragraphs that described (1) counsel's initial conversation with the two jurors about Juror No. 2's comment about her brother-in-law; and (2) how the other jurors decided that the prolific abuse could have occurred without being suspected or detected. However, the court admitted Juror No. 2's statement to the other jurors about her brother-in-law's experience.

As to the investigator's declaration, the court struck the statement that Juror No. 2 said her brother-in-law's experience had shaped her sense of the Zambrana-Aleman case. Finally, the court struck similar statements from Juror No. 2's unsigned witness statement.

Following these evidentiary rulings, the court ruled that Zambrana-Aleman had not made a prima facie case of juror misconduct. "The question on the questionnaire was: Have you or anyone close to you ever been sexually molested as a child? Her answer was no. [¶] As noted by the parties, the questions did not define the term 'close.' According to Defense Exhibit A, her husband's family is a large family. There is no evidence that [Juror No. 2] has ever met her brother-in-law or has—let alone that she considered him to be close. I don't think the fact that she couldn't remember whether she included it on the questionnaire indicates that they have a close relationship. She couldn't even remember telling the story in voir dire."

In addition, the court found that, even had the defense established a prima facie case of misconduct, it had not shown a substantial likelihood of actual bias. Juror No. 2's nondisclosure appeared to be unintentional; her statements in voir dire and on the jury questionnaire confirmed that she could be fair and follow the law; and she voluntarily disclosed that she found the charges horrific. "If she wanted to get her way onto the jury and hide an experience that she had, she wouldn't have written that." Observing that jurors are properly allowed to view the evidence "through the lens of their experience," the court found no evidence of bias and denied the new trial motion without an evidentiary hearing.

## B.    *Analysis*

The relevant principles are stated in *People v. Duran* (1996) 50 Cal.App.4th 103, 111–113 (*Duran*).) " ' "*Voir dire* examination serves to

18

protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." [Citations.] [¶] "A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct." ' " (*Id*. at pp. 111–112.)

When a party seeks a new trial based on jury misconduct, the trial court must first determine whether the moving party's evidence is admissible. If it is, the court must then consider whether the facts establish misconduct and may, at its discretion, hold a hearing to determine the truth of the allegations of misconduct. " 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a *strong possibility* that prejudicial misconduct has occurred. Even [then], an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " Finally, if the court finds that misconduct occurred, it must determine whether it was prejudicial. (*Duran, supra*, 50 Cal.App.4th at p. 113.)

"Intentional concealment of relevant facts or the giving of false answers by a juror during the voir dire examination constitutes misconduct [citations], and the occurrence of such misconduct raises a rebuttable presumption of prejudice." (*People v. Blackwell* (1987) 191 Cal.App.3d 925, 929.)

19

Inadvertent or unintentional failures to disclose, however, are not accorded the same effect. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175.) In such cases, the test is "whether the juror is sufficiently biased to constitute good cause for the court to find . . . that he is unable to perform his duty." (*Ibid; People v. San Nicolas* (2004) 34 Cal.4th 614, 644.) "[A]n honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias. Moreover, the juror's good faith when answering voir dire questions is the most significant indicator that there was no bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 300.) The trial court's determination on a new trial motion rests within its discretion and will not be disturbed unless a manifest and unmistakable abuse of that discretion clearly appears. (*Duran, supra,* 50 Cal.App.4th at p. 113.)

With these principles in mind, we turn to Zambrana-Aleman's contention that the court abused its discretion in finding no intentional nondisclosure and declining his request for an evidentiary hearing at which Juror No. 2 would be subpoenaed to testify.[8] He asserts the court placed undue weight on the fact that the juror questionnaire failed to define "close" in asking whether anyone close to the prospective juror had been molested as a child. Observing that several other jurors disclosed relationships that were more remote, Zambrana-Aleman argues those disclosures should have made it obvious to Juror No. 2 that her relationship to her brother-in-law was within the scope of the question. Similarly, he criticizes the court's observation that there was no evidence Juror No. 2 had ever met her brother-in-law, let alone considered him to be close, arguing the juror's ability to

---

[8] Zambrana-Aleman does not challenge the court's evidentiary rulings.

20

remember her brother-in-law's experience during jury deliberations indicated that they were in fact close.

Neither point is persuasive. While select segments of the voir dire could arguably support Zambrana-Aleman's suggested inferences, the totality does not. In addition, Juror No. 2's voluntary disclosure that she found the charges "horrific" further supports the court's finding any nondisclosure was inadvertent. As the trial court noted, "If she wanted to get her way onto the jury and hide an experience that she had, she wouldn't have written that." The court also reasonably found the fact that Juror No. 2 initially did not recall that she had mentioned her brother-in-law's experience in the jury room was further evidence that "she didn't have an agenda or she wasn't biased against Mr. Zambrana-Aleman." On this record, the trial court's determination that Juror No. 2's nondisclosure was inadvertent and without bias was well within its discretion.

Zambrana-Aleman's cited federal authorities, which present significantly different factual circumstances, do not support a contrary conclusion. In *United States v. Allsup* (9th Cir. 1977) 566 F.2d 68, 71–72, the Ninth Circuit presumed bias because of the employee relationship of two jurors who worked for a different branch of the same bank the defendant was accused of robbing because "[t]he potential for substantial emotional involvement, adversely affecting impartiality, is evident when the prospective jurors work for the bank that has been robbed." (*Id.* at p. 71.) In *United States v. Eubanks* (9th Cir. 1979) 591 F.2d 513, the court reversed a heroin conspiracy conviction for retrial because a juror was found to have failed to disclose that two of his sons were incarcerated for serious felonies committed in an effort to obtain heroin. (*Id.* at pp. 516–517.) In *Dyer v. Calderon* (9th Cir. 1998) 151 F.3d 970, the court found a juror "lied repeatedly" in order to

21

"secure her seat on the jury." When asked whether any relative had been accused of any offense other than a traffic case, the juror failed to disclose that her husband had recently been arrested and was then incarcerated for rape, and her brother had been shot and killed in a manner similar to the case before her. These are significantly different factual situations than the case before us. Here, without evidence showing what, if any, relationship Juror No. 2 had with her brother-in-law, there is no basis to presume bias. Nor does the record otherwise establish falsity or intentional concealment that would constitute misconduct. Moreover, Juror No. 2 clearly affirmed that, despite her personal belief in the "horrific" nature of the charges, she could still "listen to & weigh the evidence." The trial court reasonably credited her explanation and found that, under these circumstances, there was no showing of actual bias. We find no reason to disturb its determinations here.[9]

## DISPOSITION

The judgment is affirmed.

---

[9] Because the court properly found no bias, we will not address Zambrana-Aleman's contention that the alleged bias was prejudicial.

22

_____

Desautels, J.*

WE CONCUR:


_____

Pollak, P.J.


_____

Streeter, J.

*A161473  People v. Zambrana-Aleman*

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23