Filed 11/14/25  P. v. Cervantes CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B334858 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA078372) |
| v. | |
| JESS MARTINEZ CERVANTES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Affirmed.

Verna Wefald; Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Jess Martinez Cervantes of continuous sexual abuse of his daughter beginning when she was nine years old.  The jury also convicted him of sexual offenses against the 14-year-old daughter of his cousin.  On appeal, defendant argues expert testimony on child sexual abuse accommodation syndrome (CSAAS) was irrelevant and its admission constitutes reversible error.  Defendant further contends his 45-year-to-life indeterminate sentence constitutes cruel and unusual punishment.

We conclude the CSAAS evidence was relevant to explain the victims' behavior after the abuse, as well to explain why defendant's family members did not observe the abuse given its secretive nature.  We also reject defendant's challenge to his sentence as contrary to legal authority, as defendant concedes.  Accordingly, we affirm.

## BACKGROUND

The record is extensive.  Given defendant's claim CSAAS testimony was irrelevant, our summary of the proceedings and testimony is necessarily detailed.

### 1.    *The information*

In an amended information, the People alleged that on February 9, 2020, when L.L. was 14 years old, defendant committed a lewd act by sexually penetrating her by use of force, molested L.L., and showed her pornography.  The People also alleged that between September 18, 2012 and September 18, 2015, defendant engaged in three or more acts of substantial sexual conduct and three or more lewd and lascivious acts with

2

J.C., a child then under the age of 14.[1] With respect to sexual penetration by use of force and continuous sexual abuse, the People alleged there were multiple victims for purposes of Penal Code[2] section 667.61, often referred to as the "One Strike" law. The People alleged defendant suffered a prior serious or violent felony conviction in 2016.

## 2. *Motion in limine to exclude CSAAS testimony*

In a pretrial motion in limine, defendant argued the testimony of prosecution's proposed expert on CSAAS, Lauren Maltby, was irrelevant: "Defense does not have any oral or written statements as to what she is expected to testify to. So there's no offer of proof or relevance established. Further, Maltby has not even evaluated any of the [victims], so there's no relevance as to whether her testimony applies in this particular case." At a hearing prior to trial, defense counsel reiterated, "I'm not sure how her testimony would be relevant in this case or how it even applies to the particular facts."

The prosecutor explained experts who testify about CSAAS do not examine the victims. Instead, they describe child sexual abuse victims' coping mechanisms "to dispel the myths that currently people believe."

The court responded, "The court would allow her testimony to come in." When the prosecutor indicated she did not have any oral or written statements by Maltby, the court asked the prosecutor to arrange a meeting with defense counsel and Maltby

---

[1] The People also alleged, but later dismissed, a count of sexual battery by restraint involving L.L.

[2] Undesignated statutory citations are to the Penal Code.

3

before Maltby testified so that defense counsel would have a summary of Maltby's anticipated testimony. The prosecutor agreed to do so.

### 3. *Evidence at trial*

#### a. J.C. (defendant's daughter)

J.C. was 20 years old at the time of trial. She testified defendant began abusing her when she was nine years old. Initially, he touched the top of her vagina with his hand. During another incident, defendant put his penis in J.C.'s mouth. During a third incident, defendant rubbed her vagina using a circular motion. During a fourth incident, defendant rubbed her thigh, kissed her lips, and then told her, " '[T]his is our little secret.' " J.C. described a fifth incident when defendant touched her vagina over her underwear and moved his hand in a circular motion. J.C. described a sixth incident when defendant rubbed her breasts. J.C. described another incident where defendant put his penis against J.C.'s vagina, but did not penetrate her vagina.

During cross-examination, defense counsel elicited testimony that in 2016, J.C. did not tell police about all these incidents. Counsel asked J.C. whether she told police defendant had rubbed her on top of her underwear, and she answered, "No." Counsel asked J.C. whether she told "police that your dad rubbed your vagina in a circular motion" and after refreshing her recollection, J.C. responded, "No." J.C. admitted she never told police defendant put his penis in her mouth. When asked during cross-examination, J.C. acknowledged she did not tell police defendant laid on top of her or that his penis touched her thigh. J.C. also admitted she did not tell police that defendant said, " '[T]his is our little secret.' "

4

During further cross-examination, J.C. admitted although she told a nurse on November 18, 2016, that defendant's tongue was in her mouth, she did not report that to police. J.C. told the nurse the abuse ended in 2016, but she told police it ended in 2015. J.C. admitted when she spoke to the nurse, she described defendant's hands "moving back and forth," not in a circular motion. J.C. admitted she did not tell the nurse that defendant put his penis in her mouth. During cross-examination, J.C. also testified she did not wake up her siblings when she asked defendant not to rub her feet. She testified when defendant tried to put his penis in her mouth and put two fingers in her mouth, her siblings were sleeping and did not wake up.

J.C. told the jury that a sheriff detective interviewed her in February 2020. J.C. admitted she told the detective she could not recall what defendant "did to" her. J.C. later told the detective defendant abused her approximately 10 times, but she had earlier reported 15 times. In February 2020, for the first time, J.C. mentioned that defendant forced her to touch his penis. In 2020, for the first time, J.C. mentioned defendant "would have [her] jerk him off . . . ." In 2020, for the first time, J.C. mentioned defendant digitally penetrated her. When she was interviewed in 2016, she reported he had stroked her vagina, not that he digitally penetrated it.

Defense counsel asked J.C. about a 2020 interview with an assistant district attorney. During that interview, J.C. reported defendant rubbed her chest and thighs over her clothing, pulled down his boxers, and kissed her lips. When asked if her siblings "w[o]ke up" during the incident, she relayed they did not. In the interview with the district attorney, J.C. reported defendant put her "mouth on his hard penis," but she did not disclose that to

5

police in her 2016 interview. J.C. again testified her siblings did not wake up when defendant put her mouth towards his penis. In the same interview, J.C. stated defendant rubbed the lip of her vagina above the clitoris, but she had not mentioned that in any earlier interview. J.C. reported an incident where she and her brother were sharing a blanket and defendant touched her under the blanket, but did not "disturb" her brother. In the 2020 interview, and for the first time, J.C. mentioned an incident where defendant put J.C.'s legs on top of his and then rubbed her legs. J.C. stated she told the assistant district attorney she made an "ow" sound when defendant inserted his finger in her vagina and that sound did not awaken her sibling.

On cross, J.C. admitted she remembered certain details at trial even though she did not recall them at the preliminary hearing. She also admitted she remembered an additional incident at trial that she did not recall at the time of the preliminary hearing. J.C. testified when defendant tried to put his penis in her mouth, her brother did not wake up. At the preliminary hearing, J.C. did not mention defendant kissing her on the lips.

During redirect testimony, J.C. testified she did not initially tell anyone about the abuse because she was ashamed and afraid. When a nurse asked her questions, however, the questions triggered additional memories. J.C. admitted her responses varied during the interviews but explained the interviewers did not ask the same questions.

### b.    L.L. (the daughter of defendant's cousin)

L.L. was 14 years old on February 9, 2020, when defendant sexually abused her. L.L. testified when defendant drove her to run an errand, he parked the car and then told her, "[H]e was

6

really good with pleasing women" and he "knew how to please younger women." When the car stopped in the parking lot outside a store, defendant showed L.L. pictures of his penis and "bragg[ed]" about "how hard he got." Defendant also showed L.L. pictures of him and his girlfriend during sexual intercourse. After defendant put down his phone, he touched L.L.'s breast and then moved to her "pants area." Defendant inserted his fingers in L.L.'s vagina. When he drove her home, defendant told her not to tell her parents. In a "threatening way," defendant asked L.L., " 'Do you know what will happen if you say anything to your parents?' "

When they returned home, L.L. went to her room; she "was trying to . . . grasp everything that had just happened." Defendant sent her messages through "Facebook Messenger," and asked, " '[Y]ou know what I would do if your parents were asleep right now?' " L.L. pretended to like the messages because she feared defendant. The next day, defendant told L.L. to delete the messages, and she did.

On February 10, 2020, L.L. told her mother about defendant's conduct.

On cross-examination, L.L. admitted she gave inconsistent reports as to whether the above-described incident occurred before entering the store or after exiting the store. At the preliminary hearing, she testified it occurred after they left a store. L.L. did not recall it occurred before entering the store until the assistant district attorney showed her a video. On cross-examination, defense counsel asked L.L. if on February 10, 2020, she told her friends defendant had molested her and she answered, "No." When asked if she tried to get the store clerk's attention immediately after the abuse, L.L. responded, "No."

7

### c.    Dr. Lauren Maltby's testimony

Maltby did not interview the victims or review the police reports. Maltby testified CSAAS is a "group of concepts" to explain to persons unfamiliar with child sexual abuse "why children who have been sexually abused do or don't do certain things . . . ." Maltby stated CSAAS addresses why sexually abused children do not fight their abusers or report the abuse: "[M]any adults when they're first thinking about sex abuse think . . . if someone touched me sexually, I would scream; I would fight back; I would go to the police immediately and tell. And that makes a lot of sense from the perspective of a physically and psychologically mature adult. But it doesn't . . . make sense from the perspective of a child when that sexual abuse is occurring in the context of a long-term relationship." Maltby, however, cautioned against misuse of CSAAS to prove the sexual abuse occurred. "It is a group of concepts. It should not be used to diagnose sex abuse."

Significant to defendant's challenge on appeal, Maltby testified child sexual abuse is composed of five components: secrecy, helplessness, accommodation, delayed unconvincing disclosure, and retraction. According to Maltby, secrecy is based on the hidden nature of sexual abuse and a perpetrator's efforts to keep his or her crime secret through, inter alia, threats, bribes, and special attention. Children also may keep sexual abuse secret out of fear they will not be believed, or to prevent disruption to their family. To keep the abuse secret, the perpetrator might choose times when "everyone else is asleep" or when no one else is home. According to Maltby, it is common for adults in the home to lack any knowledge of a child's sexual

8

abuse. The abuse can occur when everyone in the household is sleeping or can be so brief as not to be noticed.

In the context of discussing helplessness, Maltby testified it was common for children who are sexually abused to refrain from fighting back. Some children freeze and others worry about what might happen to the perpetrator. Sometimes children are "confused" and do not recognize the conduct was wrong until later.

Maltby explained children accommodate by blocking out the abuse. That is why "kids can still seem pretty functional even while abuse is occurring." Blocking out the abuse makes it "common for victims of sexual abuse to act like nothing has happened right after sexual abuse."

In the context of discussing disclosures, Maltby testified that as they mature and learn "more vocabulary," children may make different disclosures. "[F]or instance, if I interview a child who is ten and [the child] might say 'This person peed on me;' and then when [the child is] 17 [the child] might say, 'He ejaculated on me,' that's because" the child learned the "proper term." Maltby also discussed that delayed disclosure sometimes occurs "piece by piece or bit by bit." Few children report every detail of the abuse when initially disclosing sexual abuse. The content of the disclosure also often depends on how a child is questioned.

Finally, with respect to recantation, about 20 percent of children who are sexually abused recant.

### d. Defendant's testimony

Defendant denied any sexual activity with J.C. between 2012 and 2016. Defendant denied any sexual activity with L.L. on February 9, 2020. He admitted he pleaded no contest to felony

9

child abuse in 2016.  He admitted he had photographs of his penis and nude photographs of himself and his ex-girlfriend on his phone.

### e.    Other Trial Evidence

A nurse who examined L.L. testified L.L. had a small abrasion inside her vagina consistent with digital penetration, but also consistent with poor hygiene or tight clothing.

L.L.'s mother testified she is defendant's cousin but she regarded him like a sibling.  On February 9, 2020, L.L. did not tell mother anything about defendant.  On February 10, 2020, L.L. did not want to go with defendant to a store and so defendant went alone.  Once L.L. knew defendant had left the house, L.L. told her mother defendant had sexually abused her.  L.L.'s mother testified L.L. "struggled" to tell her about defendant's sexual abuse and cried when she did.  L.L.'s mother recalled defendant told her that he had showed L.L. pornographic pictures accidentally, but denied any other conduct.

A senior criminalist testified male DNA was detected on a sample from L.L.'s mons pubis (the area above the pubic bone) but not enough DNA was collected to develop a profile.  The criminalist admitted on cross that DNA could be from a female grabbing a towel that a male had touched.  A defense DNA expert testified the amount of DNA was so small that testing it would not be reliable.

J.C.'s siblings testified they did not believe father sexually abused J.C. and they never observed any sexual conduct between defendant and J.C.  Defendant's sister testified she never saw defendant sexually abuse J.C. or any child, and did not believe J.C.  Defendant's mother testified she did not observe defendant sexually abuse his children or other children.  Defendant's

ex-girlfriend testified she never observed defendant engage in sexually- related conduct around children. She admitted, however, she told police J.C. beat father for "pulling out his penis" in front of defendant's three-year-old child. J.C.'s family members testified that J.C. was dishonest.

### 4.    *Instruction on CSAAS evidence*

The court instructed the jury, "You may consider this evidence only in deciding whether or not [L.L.] and [J.C.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

### 5.    *Conviction*

The jury convicted defendant of all counts. Defendant then waived a jury trial as to his strike and admitted the prior strike allegation.

### 6.    *Sentence*

The trial court imposed a total aggregate indeterminate term of 45 years to life consecutive to a determinate term of seven years six months and consecutive to a 364-day county jail term.

## DISCUSSION

### A.    The Court Did Not Err In Admitting CSAAS Testimony

Defendant argues CSAAS evidence is admissible only " 'for the limited purpose of disabusing the fact finder of the common misconceptions it might have about how child victims react to sexual abuse.' " Defendant further contends, "CSAAS is not

11

admissible, however, when the alleged victim's credibility has not been attacked based on one of the five factors." Because the irrelevant testimony was prejudicial, the trial court erred in admitting it.

Evidence Code section 210 defines "[r]elevant evidence" as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has wide discretion to evaluate relevance. We review the trial court's evidentiary rulings on relevancy for abuse of discretion. (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*).)

### 1. Background on CSAAS

Expert testimony on "the common reactions of child molestation victims," known as CSAAS theory evidence, "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident— e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) " ' "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' [Citation.]" (*People v. Julian* (2019) 34 Cal.App.5th 878, 885; see also *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503.)

Expert testimony on child abuse accommodation syndrome has been admissible for limited purposes for decades.[3] (*People v.*

---

[3] *Bowker* applied *People v. Bledsoe* (1984) 36 Cal.3d 236, which considered the rape-trauma syndrome. *Bledsoe*, cited by

*Bowker* (1988) 203 Cal.App.3d 385, 392 (*Bowker*); *Sedano, supra,* 88 Cal.App.5th at p. 479.) *Bowker* emphasized expert testimony cannot "allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." (*Id.* at p. 393.) Also, CSAAS evidence is not admissible when the defendant has admitted the sexual abuse. (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64.) It also is not relevant when there is "no testimony" a victim delayed reporting or recanted and the defendant does "not question their credibility at trial." (*Id.* at p. 54.)

In contrast, "[w]hen a victim's credibility is placed at issue due to 'paradoxical behavior, including a delay in reporting,' [citation]" CSAAS testimony is admissible to disabuse a jury of misconceptions about how a child reacts to molestation. (*People v. Flores* (2024) 101 Cal.App.5th 438, 456; see also *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450 [where there is evidence of a victim's "delayed disclosure and inconsistent statements" CSAAS evidence is relevant and admissible].) "An expert's explanation of CSAAS 'is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' [Citation.]" (*Sedano, supra,* 88 Cal.App.5th at p. 479.)

---

defendant, stated that expert testimony on the syndrome "may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at pp. 247–248.)

13

## 2. The CSAAS evidence was relevant here to explain the victims' delay in, or incomplete reporting, the secret nature of child abuse preventing family members and others from observing the abuse, and why victims do not fight their abusers or otherwise seek immediate help

We assume for the sake of argument defendant is correct that CSAAS evidence is admissible only when opposing counsel implicates CSAAS factors to attack the victim's credibility. Even under this premise, upon cross, attempting to discredit the victims' testimony, defense counsel's invoked the very myths CSAAS evidence seeks to dispel.

For example, Maltby testified sexual abuse generally occurs in secret thus explaining why others in the vicinity of the abuse do not observe it. On cross, defense counsel repeatedly questioned J.C. about the failure of family members in the home to observe J.C.'s abuse thus implying the abuse never really happened. Similarly, defendant introduced evidence from J.C.'s siblings, grandmother, and his ex-girlfriend that no one observed defendant sexually abuse J.C. As another example, Maltby testified child abuse victims' piecemeal disclosure is common. Defense counsel again implicated that CSAAS factor in (1) questioning J.C. at length about her failure to give a complete account of her abuse in her 2016 interview with police; and (2) referring to inconsistencies in her other interviews.

Whereas Maltby testified many adults would scream or fight back when molested, children often do not because they feel helpless. When defense counsel cross-examined L.L. on why she did not fight back or immediately notify anyone in the store of

14

defendant's abuse, he was relying on one of the "myths" CSAAS testimony seeks to dispel.

In sum, CSAAS evidence was relevant to explain the victims' incomplete and delayed reporting, the secretive nature of sexual abuse and why others in the vicinity of the abuse may not have observed it, and the failure of child sexual abuse victims to fight their abusers or seek immediate help.  Contrary to defendant's appellate argument, trial defense counsel hammered on the victims' credibility and did so invoking the very myths CSAAS testimony is designed to dispel.

Because we conclude the CSAAS evidence was relevant, we do not address defendant's argument admission of that evidence prejudiced him.

## B. Defendant's Sentence Is Not Cruel and Unusual Punishment Under the Federal or State Constitution, and Defendant Concedes His Argument to the Contrary Is Not Supported By Case Law

Although acknowledging case law does not support his challenge, defendant contends:  "[I]t is time to reexamine whether sex offenses such as the ones appellant has been convicted of violate the Eighth Amendment.  This is particularly so, when a sentence of 45 years to life is tantamount to life without parole, given appellant's age of 52 years.  [Citation.] Even without the strike prior the total sentence would be 30 years to life.  Given appellant's medical history, this would still be the equivalent of life without parole."

### 1. Additional background

In his sentencing memorandum in the trial court, defendant requested the court find that the One Strike

15

sentencing scheme as applied to his sentence constitutes cruel and unusual punishment.  He asked the court to impose a 12-year determinate sentence.  Defendant argued defendant did not use a firearm in the commission of his crimes against J.C. and L.L.  Defendant emphasized his past criminal conduct did not involve sex crimes.  Defendant asserted he "suffers from PTSD, trauma, substance abuse dependence, Major Depressive Disorder, [and] Suicidality (drug overdose)."  (Boldface omitted.)  Defendant further asserted:  He "has a history of gunshot wounds to his neck, abdomen, and lower left extremities in 1991.  He was shot '6 times (1990s), stabbed 27 times, and was hit in the head with a bat (1980s, 1990s).'  He has limitations with his legs and hands due to his injuries.  Mr. Cervantes had a head injury around age 49, in which he was knocked unconscious for 10 to 20 minutes and he hit the back of his head.  He suffered from a work accident while he was working with wood but he did not receive any medical treatment."  (Boldface omitted.)

Attachments to the sentencing memorandum, however, indicate defendant "denied suicidal ideation and he endorsed very few symptoms associated with depression."  The attachment recites that his depressive symptoms were "due to his current legal matter and residing in jail."  Attachments to his sentencing memorandum also indicated defendant's asserted mental disorders (PTSD, trauma, substance abuse dependence, major depressive disorder, and suicidality) were "prior diagnoses" and his current diagnoses includes only PTSD and anxiety.

In their sentencing memorandum, the People requested the trial court impose a 45-year-to-life indeterminate term pursuant

16

to the One Strike law.[4]  The People detailed defendant's criminal history:  Burglary (1988), possession of a dangerous weapon (1989), use or under the influence of a controlled substance (twice in 1989), possession of controlled substance paraphernalia (1994), transportation sales of a controlled substance (1994); possession of a controlled substance (1996); driving while under the influence (1998); petty theft with a prior (1998); corporal injury on a spouse cohabitant (2005 and 2006); cruelty to a child (2011); and child abuse (2016).

The probation report calculated defendant had an average risk of recidivism for sexual offenses.

### 2. Case law does not support defendant's constitutional challenge to his sentence

On appeal, defendant's describes his constitutional challenge to his sentence:  "A sentence of 45 years to life for someone who did not kill anyone is cruel and unusual punishment under the Eighth Amendment."  (Boldface omitted.) Defendant acknowledges federal and state prohibitions against cruel and unusual punishment apply to sentences that " 'are "grossly disproportionate" to the crime' " or individual culpability of the defendant.  (See *Ewing v. California* (2003) 538 U.S. 11, 23; see also *id.* at p. 20 ["The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' [Citations.]"; *People v. Dillon* (1983) 34 Cal.3d 441, 478 [art. I, § 17 of the Cal. Const. prohibits a punishment that is "grossly disproportionate to the offense for which it is imposed."].)

---

[4]  Section 667.61.

17

Defendant also acknowledges his argument is belied by case law.  In his reply, he cites *People v. Crooks* (1997) 55 Cal.App.4th 797, in support of his concession that "courts have held that a life term under the One Strike offense provisions was not cruel and unusual punishment under either the federal or California Constitutions, despite the fact the defendant did not kill anyone."  (Accord, *People v. Reyes* (2016) 246 Cal.App.4th 63, 88–90 [for an adult offender, life without the possibility of parole and eight-year-determinate term not cruel or unusual punishment for convictions of forcible oral copulation, forcible rape, lewd acts upon a child under the age of 14, and first degree burglary]; see also *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1223 [135-year sentence not cruel or unusual punishment for multiple sex crimes]; *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1282 ["[S]entence of 25 years to life for forcible rape in the course of a burglary committed with the intent to commit forcible rape is neither cruel nor unusual punishment under the California Constitution."].)

Indeed, recently, our high court rejected an equal protection challenge to section 3051, which provides early parole consideration for young adult offenders, including murderers, but excludes One Strike young adult offenders.  (*People v. Williams* (2024) 17 Cal.5th 99, 127–128 (*Williams*) ["[T]he Legislature could rationally exclude One Strike offenders from early parole under section 3051 based on a combination of concerns:  the increased risk of recidivism that One Strike offenders pose and the aggravated nature of their offenses."].)

Defendant's only retort to this precedent is that Eighth Amendment law is "evolving."  In support of this proposition, he cites Justice Mosk's concurring opinion in *People v. Deloza* (1998)

18

18 Cal.4th 585, 600–602, and Justice Liu's dissent in *Williams*. (*Williams*, *supra*, 17 Cal.5th at p. 138 [dis. opn. of Liu, J.].) Neither has precedential value and the rationale underlying those opinions is inapplicable to defendant.

Relying on Justice Mosk's opinion in *People v. Deloza*, *supra*, 18 Cal.4th at p. 600, defendant argues his sentence is cruel or unusual because it exceeds his life expectancy. That case was not a One-Strike case, but instead a "Three-Strike" case in which the question before the high court was whether consecutive sentencing on multiple offenses was mandatory and the court decided the trial court "erroneously believed consecutive sentences were mandatory." (*Id.* at p. 600.) In his concurring opinion, Justice Mosk posited his own question: "Is a sentence of 111 years in prison constitutional?" (*Ibid.* [conc. opn. of Mosk, C.J.].) He concluded a 111-year sentence violates federal and state prohibitions against cruel and unusual punishment. The case before us does not involve a sentence beyond human life expectancy and as noted above, even a sentence of life without the possibility of parole as to an adult One Strike offender does not constitute cruel and unusual punishment.

Defendant also relies on Justice Liu's dissenting opinion in *Williams*. In that opinion, Justice Liu agreed "aggravated sex offenses covered by the One Strike law . . . are abhorrent and deserve harsh punishment." (*Williams*, *supra*, 17 Cal.5th at p. 138 [dis. opn. of Liu, J.].) Justice Liu, however, concluded young adult offenders "whatever their crime, have diminished culpability and are capable of growth and rehabilitation." (*Id.* at p. 139 [dis. opn. of Liu, J.].) Here, defendant was not a young adult offender when he committed his sex abuse against J.C. and L.L. Defendant was a mature adult when he committed those

19

crimes, approximately 40 years old when he started abusing J.C., and approximately 50 years old when he abused L.L. Justice Liu's reasoning thus does not apply to defendant.

## DISPOSITION

The judgment is affirmed.
<u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.